**H.B. FULLER CO., Plaintiff,**

v.

**NATIONAL STARCH AND CHEMICAL CORP., Defendant.**

Civ. No. 4–85–1632.

United States District Court,
D. Minnesota,
Fourth Division.

June 21, 1988.

Alan D. Carlson, Mark D. Schuman, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, Minn. (Susan F. Marrinan, H.B. Fuller Co., St. Paul, Minn., of counsel), for plaintiff.

Charles Quaintance, Jr., Maslon, Edelman, Borman & Brand, Minneapolis, Minn., Stephen B. Judlowe, William G. Todd, Porter F. Fleming, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City (Louis J. Virelli, Nat. Starch and Chemical Corp., Bridgewater, N.J., of counsel), for defendant.

## MEMORANDUM AND ORDER INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

MacLAUGHLIN, District Judge.

## I. BACKGROUND

Plaintiff H.B. Fuller Co. (Fuller) is a corporation organized and existing under the laws of the State of Minnesota, having its principal place of business in St. Paul, Minnesota. Defendant National Starch & Chemical Corporation (National) is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in Bridgewater, New Jersey. Fuller commenced an action for a declaratory judgment of patent invalidity and non-infringement, arising under 28 U.S.C. §§ 2201, 2202 and 1338. Fuller asserted two grounds for invalidity of the patent: obviousness and inequitable conduct. National responded to Fuller's complaint, filing a counterclaim alleging patent infringement. By stipulation of the parties prior to trial, Fuller dropped its claim of obviousness and the parties proceeded to trial before the Court on the issues of inequitable conduct, infringement and damages.

The patent in suit is United States Letters Patent No. 4,526,577 (the '577 patent). Plaintiff's Exhibit 10. The '577 patent issued July 2, 1985. The inventors are Robert Schmidt and Paul Puletti. Schmidt is employed as project supervisor, hot melt development for National. Puletti is director of product development for National but at the time the product underlying the '577 patent was developed he served as manager of hot melt development. National is assignee and record owner of the '577 patent.

The '577 patent relates to disposable articles prepared using multi-line construction and to hot melt adhesives useful for the assembly thereof. The '577 patent discloses and claims a multi-line constructed disposable diaper (or in some claims, disposable articles generally) in which the various diaper substrates are bonded by specific adhesive compositions based upon A–B–A block or A–B–A–B–A–B multi-block copolymers, where the A component is styrene and the B component is butadiene in stated ranges, together with various other chemical constituents.[1] In general, disposable diapers are composed of a polyethylene or polypropylene outside sheet and inner absorbent material covered by an in-

---

1. Specifically, claim 1 of the '577 patent states:
 A disposable article of the multi-line construction comprising at least one polyethylene or polypropylene substrate bonded to at least one tissue, non-woven, polyethylene or polypropylene substrate using a hot melt pressure sensitive adhesive composition comprising:
 (a) 15 to 35% by weight of an A–B–A block or A–B–A–B–A–B multi-block copolymer containing at least 28 parts styrene per 100 parts polymer where polymer blocks A are styrene blocks and polymer block B (the B component) is butadiene or hydrogenated butadiene;
 (b) 45 to 70% by weight of a compatible tackifying resin;
 (c) 5 to 30% by weight of a plasticizing oil;
 (d) 0 to 5% by weight of a petroleum derived wax; and
 (e) 0.1 to 2% by weight of a stabilizer.
 Plaintiff's Exh. 10, Col. 8, lines 18–35.

ner liner of non-woven tissue. Adhesives such as the type described in the '577 patent are used to bind these inner and outer layers together. Multi-line or fine line construction is an assembly using a number of thin lines of adhesive to adhere the outer polyethylene sheet to the batted, non-woven fluid absorbent layer and to the inner tissue. The adhesive is applied in the form of very fine parallel longitudinal strips or in a "multi-dot" pattern of application, requiring the use of a large number of adhesive deposits, each deposit being of a very small quantity of adhesive.

In order to be commercially acceptable a multi-line adhesive must possess certain physical properties. For example, the adhesive must possess a high degree of adhesion since it is applied in the form of a number of very fine parallel longitudinal strips thus requiring each line to possess exceptionally high bonding properties. The adhesive must also possess sufficient adhesive and cohesive strength to provide high bond strength values when subjected to stress so the constructions cannot be easily separated. It is necessary that the adhesive, upon application, not absorb through the actual disposable construction and that the adhesive bonds not only remain secure but also be flexible even after prolonged periods of storage. In addition to requiring heat and oxidation resistance on aging they must also possess sufficient bonding range and must be white or clear in color. See '577 Patent Col. 1, lines 19–40. Further, the adhesive must withstand high mixing and application temperatures without degrading and sacrificing necessary adhesive properties. Prior to the development of the adhesive described in the '577 patent the primary adhesives sold and used for multi-line diaper construction were plastic-based adhesives whose main components were ethylene vinyl acetate (EVA) copolymers or atactic polypropylene (APP) copolymers. Although suitable for multi-line construction, EVA and APP ad-

hesives in some respects fell short of the desired physical specifications.

The disposable diaper industry in the United States was and is big business. In 1983, disposable diaper sales were more than $2 billion at wholesale.[2] As such, a great financial incentive existed for adhesives manufacturers to develop an improved diaper adhesive which would capture the market. To this end, Puletti and Schmidt set about formulating an adhesive that would satisfy all the strict technical requirements for multi-line diaper construction. Their experimentation yielded fruit with the formulation in March–April 1983 of a hot-melt pressure sensitive adhesive based on an A–B–A–B–A–B multi-block copolymer with styrene endblocks and butadiene midblocks. National successfully tested the new adhesive system in the laboratory and on disposable diapers. Thereafter, Schmidt, Puletti and National patent agent Ellen Dec prepared a patent application which later issued as the '577 patent.

## II. PATENT PROSECUTION

On January 9, 1984 National filed with the Patent and Trademark Office (PTO) the patent application (Serial No. 569,001) which later issued as the '577 patent. The application was prepared by National patent agent Ellen Dec in conjunction with Schmidt and Puletti. As originally filed, the application included fifteen claims which recited a fully-constructed disposable diaper using S–B–S or S–EB–S adhesive. See Plaintiff's Exh. 24 at 17–20. On July 23, 1984 the PTO (patent examiner James C. Cannon) issued a First Office Action which rejected all fifteen claims as unpatentable. The basis for the patent examiner's ruling of unpatentability was his finding that the claimed invention would have been obvious to one of ordinary skill in the art in light of the disclosures of the Puletti (No. 4,419,494) and Harlan (No. 3,239,478) patents. The examiner's notes state:

Puletti discloses that hot melt A–B–A copolymer compositions are useful as ad-

**2.** The leading manufacturers of disposable diapers during the relevant time period were Procter & Gamble (Pampers and LUVS brands) and Kimberly Clark (Huggies brand) with a combined market share of eighty percent, and Weyerhaeuser, a manufacturer of private label disposable diapers, with approximately a fifteen percent share.

hesives for PE layers used in the production of disposable diapers.

Harlan teaches that pressure-sensitive, hot melt adhesive compositions reading on those of the above-rejected claims have utility as adhesives for PE films and non-woven fabrics.

In view of the known practice of using hot melt A–B–A copolymers as adhesives for PE layers used in disposable diapers (Puletti) and the known utility of applicants' compositions as adhesives for PE films and non-woven fabrics (Harlan), it is not seen that at the time of applicants' invention it would have been unobvious to one of ordinary skill in the art to have used the hot melt, pressure-sensitive adhesives of Harlan to adhere a PE non-woven layer to a PE film layer in the production of disposable diapers.

Plaintiff's Exh. 24 at 45.

Thereafter, Dec, Schmidt and Puletti prepared an amendment to the patent application, which amendment was submitted to the patent examiner October 17, 1984. Claim 1 of the patent was amended to more specifically define the block copolymer, and further argument was offered in support of National's claim of patentability. In brief, in their amendment National argued that while Puletti and Harlan described A–B–A type block copolymer adhesives suitable for bonding a multitude of substrates, they were not directed to or suitable for the specific end use identified by the '577 patent, *i.e.*, multi-line construction. National contended that, due to the breadth in scope of the Harlan and Puletti patents, they offered "little or no suggestion to the artisan that a limited number of compositions within their scope might be employed for this very specific end use." Plaintiff's Exh. 24 at 50.[3] National further contended that because the '577 patent was directed toward a specific end use, and the '577 patent overcame the physical deficiencies inherent in other copolymer-based adhesives, it was not obvious to one of ordinary skill in the art and did constitute a significant advance over and above the teachings of Harlan and Puletti.

Following review of the amendment, the patent examiner issued an amended Office Action approving issuance of the '577 patent. The examiner's amendment is dated March 25, 1985, and states:

> The specificity of applicants' application of adhesive, the breadth of the Puletti and Harlan disclosures, and the non-utility of many of the adhesives disclosed in said references for applicants' pur-

3. National's amendment states in substantial part:

> The Harlan patent is a basic block copolymer composition patent. It discloses adhesive compositions prepared using A–B–A type block copolymer compositions and their suitability for bonding a multitude of substrates. The reference is general in its scope and includes many adhesives which applicants have shown in their examples not to be suitable for the specific end use involved here. More particularly, the patent discloses not only adhesives containing butadiene as the B component but also those containing isoprene, (see Col. 4, lines 43–45). In contrast to these broad teachings of Harlan, adhesives prepared using the isoprene midblock copolymers are illustrated in applicants' Example II as giving substantially poorer and commercially unacceptable results with respect to adhesive strength and heat resistance.
>
> The Puletti reference, at least with respect to block copolymer based adhesive, is equally as broad as the previously discussed Harlan reference. The Puletti patent is directed to a method for improving the heat resistance of *any* adhesive based on A–B–A type block co-

polymers by incorporation therein of specific polymeric fatty acid polyamides. The section at Column 8 lines 8–15 to which the Examiner refers as teaching use as adhesives for polyethylene layers in the production of disposable diapers is directed to a completely different type adhesive, used for a completely different type of construction and having completely different end use requirements. Thus, the adhesive referred to by Puletti is of type disclosed in U.S. Pat. No. 4,259,220 ... which not only requires a polyisoprene midblock but is also used, either in place of the elastic, or to bond the elastic strip to the polyethylene substrate thereby forming a gathered legband. This construction technique is not the same as, nor are the requirements thereof related to, those of a multi-line construction adhesive.

In summary, it is applicants' position that the Harlan and Puletti patents are so broad in scope as to render little or no suggestion to the artisan that a limited number of compositions within their scope may be employed for this very specific end use. Reconsideration and withdrawal of the 103 rejection is therefore respectfully requested.

Plaintiff's Exhibit 24 at 49–50.

poses are convincing of the patentability of applicants' claims over the Puletti and Harlan disclosures.

Plaintiff's Exh. 24 at 54. Accordingly, the patent issued July 2, 1985.

Since its development, National has manufactured and sold the adhesive described in the '577 patent under the designation "adhesive composition 34–2881" to various manufacturers of disposable diapers. This product, along with similar S–B–S adhesives sold by National, has enjoyed substantial commercial success. In fact, as of the time of trial, sales to Kimberly Clark alone were approximately one million pounds per month. Furthermore, National has received royalties from other adhesive manufacturers who took non-exclusive licenses under the patent.

Fuller also manufactures a commercial S–B–S adhesive under the designation HM–1979. National contends that Fuller's product, when used in the manufacture of multi-line constructed disposable diapers, infringes the '577 patent, and it is this contention which forms the basis for National's patent infringement counterclaim. Fuller commenced this action on October 31, 1985. Fuller's complaint is in one count, and seeks a declaratory judgment that the '577 patent is invalid, unenforceable and void and not infringed by Fuller, as well as attorneys' fees and costs pursuant to 35 U.S.C. § 285. Specifically, paragraph 7 of Fuller's complaint alleges that the '577 patent is invalid, void and unenforceable by virtue of the fact it was obtained as a result of inequitable and fraudulent conduct on the PTO.

## III. NONDISCLOSURE

Before proceeding to an evaluation of the legal and factual basis of Fuller's inequitable conduct claim, a brief description of the alleged nondisclosures underlying that claim is in order.

### A. S–I–S Performance Data

As noted above, the '577 patent describes an adhesive made from the A–B–A block copolymer base, as well as a tackifier, an oil, and other chemical constituents. In A–B–A block copolymers, the A blocks (endblocks) are styrene, and the B blocks (midblocks) can be either butadiene, hydrogenated butadiene, or isoprene. Thus, an A–B–A block copolymer can be an S–B–S, S–EB–S, or S–I–S copolymer.

| | | Endblock | | Midblock | | Endblock |
|-------|---|----------|---|-----------------------|---|----------|
| S–B–S | = | styrene | - | butadiene | - | styrene |
| S–EB–S | = | styrene | - | hydrogenated butadiene | - | styrene |
| S–I–S | = | styrene | - | isoprene | - | styrene |

A–B–A block copolymers were known in the art prior to issuance of the '577 patent. The basic patent governing A–B–A block copolymers is the Harlan patent, issued in 1966. The Harlan patent generally discloses that A–B–A block copolymers can be used to make adhesives, and notes that such adhesives can "be applied to ... polyolfin films ... non-woven fabrics ... and for bonding ... such materials together." Plaintiff's Exh. 801, Harlan Patent Col. 6, line 65–68.

The Puletti patent, issued in 1983, describes a particular application of A–B–A block copolymers in connection with disposable diapers. Specifically, the Puletti patent discloses the use of the A–B–A block copolymer adhesives to attach elastic to the polyethylene or polypropylene outer layer of the diaper to form the leg band of a disposable diaper. Plaintiff's Exh. 64, Puletti Patent Col. 8, lines 8–14.

To substantiate its claims of inequitable conduct, Fuller cites allegedly fraudulent conduct on the part of National which took place in connection with the October 17, 1984 amendment proffered by National. As noted above, following the examiner's initial rejection based on the prior art teachings of Harlan and Puletti, National filed an amendment which distinguished the "specific" application of '577 from the "general" teaching of Harlan and Puletti.

Fuller contends the amendment was fraudulent.

In its October 1984 amendment, National noted that the '577 patent specifies only S–B–S and S–EB–S block copolymers, in contrast to the more expansive Harlan patent, which describes S–B–S, S–EB–S and S–I–S (isoprene) copolymers, and the Puletti patent, which refers to any A–B–A type adhesive. Fuller argues that National was able to distinguish Harlan and Puletti by stating in its amendment that S–B–S and S–EB–S copolymers were superior to S–I–S copolymers for multi-line use. Thus narrowed, the patent examiner found that '577 was, in fact, an advancement over the general teachings of Harlan and Puletti, and in that respect fully patentable. The difficulty with this argument, Fuller contends, is that S–I–S copolymers simply are not inferior in a multi-line context. Fuller claims that National knew S–I–S copolymers were not inferior and yet fraudulently led the examiner to believe otherwise. This point centers on a test of a particular brand of S–I–S copolymer—Kraton 1111—which Schmidt and Puletti conducted in connection with their research efforts. National's test suggested that adhesives using Kraton 1111 were not inferior in all respects to S–B–S and/or S–EB–S adhesives as a multi-line glue. The results of National's Kraton 1111 test, however, was not disclosed to the patent examiner, either in connection with the original application or the October 1984 amendment. Fuller contends that had National disclosed the Kraton 1111 test, the patent examiner would have concluded that S–I–S is not inferior, and would have rejected National's attempt to distinguish Harlan and Puletti.

### B. *Thermal Degradation*

During the production of multi-line disposable diapers, the multi-line adhesive is heated (melted) and applied to the various diaper substrates in a fluid form. Because this exposure to high temperature is sometimes prolonged in the manufacturing process, a multi-line hot melt adhesive must be able to survive such heat exposure in order to be usable for diaper construction. If an adhesive cannot survive at elevated temperatures, it is said to thermally degrade.

S–I–S adhesives thermally degrade and otherwise perform poorly when exposed to high temperatures for long periods in the diaper manufacturing process. When exposed to high temperatures, S–I–S adhesives progressively thin until unusable. S–I–S adhesives *do not* thermally degrade if a protective nitrogen blanket is used to prevent oxygen in the air from attacking the adhesive. Disposable diaper manufacturers are unwilling, however, to use nitrogen blankets in their manufacturing plants.

Fuller contends that in distinguishing S–B–S and S–EB–S adhesives from those based on S–I–S, National failed to disclose the real reason it believed S–I–S products to be unacceptable for multi-line construction—the required use of a nitrogen blanket to prevent thermal degradation. Fuller contends that if National excluded S–I–S adhesives from the scope of the '577 patent because S–I–S adhesives thermally degrade if not protected by a nitrogen blanket, National should have disclosed that reason to the patent examiner. Failure to state its reliance on the problems of thermal degradation, Fuller contends, constitutes inequitable conduct on the part of National.

### C. *Collins Patent*

Another nondisclosure upon which Fuller bases its claim of inequitable conduct relates to United States Letters Patent No. 4,136,699, the so-called Collins patent. The Collins patent, of which Fuller is the assignee of record, issued January 30, 1979 and discloses a sanitary napkin comprised of: (1) an elongated absorbent pad, (2) an outer covering layer in adherent contact with at least one surface of the pad, (3) an adhesive strip or layer on the exposed surface of the outer layer, and (4) a release liner for protecting the adhesive layer. Plaintiff's Exh. 630, Abstract. The adhesive layer, utilizing an S–EB–S hot melt adhesive, serves two functions. First, the outer surface of the adhesive layer "is useful for removably attaching the article to the inside of an undergarment or the like." Plaintiff's Exh. 630, Abstract. In this

function, referred to at trial as the positioning function, the adhesive acts to secure or position the sanitary napkin to a supporting garment so as to further the intended purpose of the article, *i.e.,* absorption of body fluids. Second, the adhesive layer serves a construction function which operates as follows. The structure of the sanitary napkin usually includes:

an absorbent pad enclosed in a fluid-pervious wrapper which is overlapped to provide a seam, the seam typically running lengthwise through the middle of a major surface of the pad. The layer (or layers) of [adhesive] can be applied to this seam (overlapped) area. If the [adhesive] has sufficient fluidity when applied, it can permeate the seam, binding together the overlapped area and sealing the absorbent pad inside the fluid-pervious wrapper.

Plaintiff's Exh. 630, Col. 4, lines 26–34. The adhesive layer thus aids in the construction of the sanitary napkin.

As described in the Collins patent, the adhesive layer "comprises an elongated strip of said adhesive, narrower in width than the width of said absorbent pad." Plaintiff's Exh. 630, Col. 16, line 49–51. Sanitary napkins constructed in accord with the Collins patent have at times used multiple strips or lines of adhesive to accomplish the positioning and construction function described by the Collins patent. *See* Defendants's Exh. 110–11. Fuller contends that this application of adhesive constitutes multi-line construction which, because of the use of a butadiene adhesive, falls within the claims of the '577 patent. Fuller thus contends the Collins patent was highly relevant to National's application for the '577 patent and its nondisclosure constitutes inequitable conduct rendering the '577 patent invalid.

## IV. INEQUITABLE CONDUCT

■ It is well accepted that every patent applicant has an "uncompromising duty" to report to the PTO facts and information affecting the patentability of the claimed invention. *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945). Title 37 C.F.R. § 1.56(a) provides:

A duty of candor and good faith toward the [PTO] rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantially involved in the preparation or prosecution of the application.... All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application.

Patent applicants accordingly must show the highest degree of candor and good faith. *Kingsland v. Dorsey,* 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949).

■ When a patent applicant fails to uphold this duty of candor and good faith, and procures a patent by withholding material information from, or submitting false information to, the PTO, the applicant is said to have procured the patent through inequitable conduct or fraud on the PTO. A patent obtained by inequitable conduct is unenforceable. *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1560 (Fed.Cir. 1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Inequitable conduct is broader than, and should be distinguished from, common law fraud. *J.P. Stevens,* 747 F.2d at 1559. Common law fraud requires: (1) misrepresentation of a material fact, (2) intent to deceive or a state of mind so reckless respecting consequences as to be the equivalent of intent (scienter), (3) justifiable reliance on the misrepresentation by the party deceived, inducing him to act thereon, and (4) injury to the party deceived resulting from reliance on the misrepresentation. *Norton v. Curtiss,* 433 F.2d 779, 793, 57 CCPA 1384 (1970). Inequitable conduct is broader than common law fraud and "includes failure to disclose material information, or submission of false material information, with an intent to mislead." *J.P. Stevens,* 747 F.2d at 1559.

■ Inequitable conduct is an issue of law based on two factual findings, materiality and the level of culpability or intent.

*J.P. Stevens,* 747 F.2d at 1559–60; *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350 (Fed.Cir.1984), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Inequitable conduct requires proof by clear and convincing evidence of a threshold degree of materiality of the non-disclosed or false information and a threshold level of intent. *J.P. Stevens,* 747 F.2d at 1559–60. After the actual levels of materiality and intent are determined, the Court must balance them and determine as a matter of law whether the scales compel a conclusion that inequitable conduct occurred. *Atlas Powder Co. v. E.I. Dupont DeNemours & Co.,* 750 F.2d 1569, 1578 (Fed.Cir.1984).

■ As to the materiality element, inequitable conduct requires proof of a threshold degree of materiality of the non-disclosed or false information. *J.P. Stevens,* 747 F.2d at 1559; *Atlas Powder,* 750 F.2d at 1577. That threshold can be measured by any of four tests:

(1) an objective "but for" standard, which requires a showing that the patent would not have issued "but for" the misrepresentation or concealment;

(2) a subjective "but for" standard, which requires a showing that the PTO examiner would not have allowed the application if he or she had known the facts in question;

(3) a "but it may have been" standard, which requires a showing that the facts might reasonably have affected the examiner's decision as to patentability; and

(4) the standard set forth in PTO Rule 1.56(a), *i.e.,* whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent.

*See J.P. Stevens,* 747 F.2d at 1559; *American Hoist,* 725 F.2d at 1362; *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 585 F.Supp. 1516, 1524–25 (S.D.N.Y.1984), *vacated and remanded,* 778 F.2d 1571 (Fed.Cir.1985). The United States Court of Appeals for the Federal Circuit has declared that the PTO standard is the appropriate starting point

for any discussion of materiality, in that it is the broadest standard, thus encompassing the others, and because that materiality boundary most closely aligns with how one ought to conduct business with the PTO. *American Hoist,* 725 F.2d at 1363.

■ Inequitable conduct also requires proof of a threshold level of intent. *J.P. Stevens,* 747 F.2d at 1560, *citing Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529 (Fed.Cir.1984). That intent need not be proven with direct evidence. *Atlas Powder,* 750 F.2d at 1578. It may be proven by showing acts the natural consequences of which are presumably intended by the actor. *J.P. Stevens,* 747 F.2d at 1560; *Atlas Powder,* 750 F.2d at 1578. Proof of deliberate scheming is not needed; gross negligence is sufficient. Gross negligence is present when the actor knew or should have known of the materiality of a withheld reference or of an affirmative misstatement. *J.P. Stevens,* 747 F.2d at 1560, *citing Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed.Cir.1984); *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1152 (Fed.Cir.1983). On the other hand, simple negligence, oversight or an erroneous judgment made in good faith is not sufficient. *J.P. Stevens,* 747 F.2d at 1560, *citing Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1383 (Fed.Cir.1983). Therefore, although subjective good faith alone is not a complete defense to a charge of inequitable conduct, *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.,* 759 F.2d 10, 14–15 (Fed.Cir.1985), *cert. denied,* 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985), simple oversight does not provide a sufficient degree of culpability. *J.P. Stevens,* 747 F.2d at 1560; *N.V. Akzo v. E.I. Dupont DeNemours,* 810 F.2d 1148, 1153 (Fed.Cir.1987).

■ Once the thresholds of materiality and intent are established, the Court must determine as a matter of law whether the relevant values establish that inequitable conduct occurred. *Atlas Powder,* 750 F.2d at 1578. In that respect, questions of materiality and intent are closely intertwined, in that the less material the proffered or withheld information, the greater the degree of intent that must be

proven. In contrast, a lesser degree of intent must be proven when the information has a great degree of materiality. Indeed, gross negligence may suffice to establish inequitable conduct if the misrepresentation has a high degree of materiality. *Akzo*, 810 F.2d at 1153; *Digital Equipment Corp. v. Diamond*, 653 F.2d 701, 716 (1st Cir.1981). The inverse relationship between materiality and intent was explained by the Federal Circuit in *American Hoist:*

> Thus, for example, where an objective "but for" inquiry is satisfied under the appropriate standard of proof, and although one is not necessarily grossly negligent in failing to anticipate judicial resolution of validity, a lesser showing of facts from which intent can be inferred may be sufficient to justify holding the patent invalid or unenforceable, in whole or in part. Conversely, where it is demonstrated that a reasonable examiner would merely have considered particular information to be important but not crucial to his decision not to reject, a showing of facts which would indicate something more than gross negligence or recklessness may be required, and good faith judgment or honest mistake might well be a sufficient defense.

*American Hoist*, 725 F.2d at 1363. Intent remains, however, a separate and essential component of inequitable conduct; materiality does not presume intent. *Allen Organ Co. v. Kimball International, Inc.*, 839 F.2d 1556, 1567 (Fed.Cir.1988).

### A. *Collins Patent*

#### 1. *Materiality*

■ Fuller contends that the Collins patent was highly material to National's application. As characterized by Fuller, Collins taught the use of a butadiene-based adhesive in a multiline constructed sanitary napkin. This application, Fuller contends, is virtually identical to that disclosed in claim 1 of the '577 patent.

In support of its claim of materiality, Fuller relies heavily on the deposition testimony of Robert Roeder. Roeder testified regarding the construction function performed by the adhesive layer in a sanitary napkin falling within the teaching of the Collins patent. Roeder explained that the adhesive layer seals the overlapping nonwoven outer covering layer of the sanitary napkin and simultaneously permeates the resulting seam, binding the non-woven layer to a polyethylene layer that lies between the non-woven layer and the inner absorbent material. Tr. 402–04. Thus described, the sanitary napkin constructed according to the claims of the Collins patent bears some similarity to the construction dynamics outlined in the patent in suit. Specifically, per the Collins patent, the sanitary napkin employs a butadiene-based adhesive to bind a non-woven to a polyethylene. This construction is accomplished by application of multiple strips of adhesive. Seizing on this apparent similarity, Fuller argues that the Collins patent describes an adhesive system identical to that described in the '577 patent. Accordingly, Fuller asserts that the Collins patent is highly material to National's application, and argues that its non-disclosure constitutes inequitable conduct on the part of National.

Although the Court has no reason to doubt the accuracy of Roeder's testimony regarding sanitary napkin construction under the Collins patent, the Court cannot accept Fuller's characterization of that construction as multi-line [4] nor its argument in favor of a finding of materiality. Initially, the Court notes that the adhesive layer disclosed in the Collins patent can be and is applied in the form of multiple lines or strips. Yet, even a cursory reading of the Collins patent and a brief examination of plaintiff's exhibit 822 and defendant's exhibits 110 and 111 illustrates that the "lines" of S–EB–S adhesive described in Collins and employed in the named exhibits are dissimilar from the multiple lines of adhesive used in the multi-line construction of diapers described in the '577 patent.

---

**4.** Interestingly, Fuller's attempt to characterize Collins-type sanitary napkin construction as "multi-line" is inconsistent with the position expressed in an opinion letter written by Fuller's counsel, which stated that the lines of adhesive used in sanitary napkin construction "would not be within the 'multi-line' concept." Plaintiff's Exh. 837 at 6.

The Collins patent contemplates application of a relatively large amount of adhesive (an adhesive "layer") to seal the overlapping non-woven material. As demonstrated, for example, by defendant's exhibits 110 and 111, a heavy strip of adhesive is applied to complete the desired construction of a Collins-type sanitary napkin. Conversely, the multi-line concept described in the '577 patent involves application of minute deposits of adhesive in very fine parallel longitudinal lines. *See* Plaintiff's Exh. 930. Even the sheer number and size of the adhesive strips shown in plaintiff's exhibit 822 and used in defendant's exhibits 110 and 111 belie Fuller's suggestion that such construction approximates multi-line construction. For example, defendant's exhibit 111 employs three adhesive strips, each approximately one-fourth inch wide. As illustrated by plaintiff's exhibit 930, however, even at its narrowest width, a multi-line constructed diaper employs more than ten fine lines of a barely measurable width. In sum, it is clear to the Court that the sanitary napkin construction described in the Collins patent does not sufficiently resemble multi-line construction to render the Collins patent material to National's application for the '577 patent.[5]

Another distinction exists between Collins and the '577 patent rendering the Collins patent immaterial to the patent in suit. The Collins patent describes a disposable article employing "an elongated strip of ... adhesive, narrower in width than the width of said absorbent pad, *which has at least partially impregnated [the] non-woven wrapper* along a seam of said wrapper...." Plaintiff's Exh. 630, Col 16, Lines 50–53. As this statement suggests, in order to effectively perform a construction function for a sanitary napkin, adhesive applied pursuant to the Collins patent must permeate non-woven material and supply adhesive properties on both sides of the material. Such adhesive penetration, however, is not desirable in the multi-line construction of disposable diapers, where adhesive penetration would bring adhesive in contact with the baby's skin and cause irritation. Accordingly, the Collins adhesive system is distinct from multi-line construction and thus the Collins patent is not particularly material to National's patent application at issue herein.

As noted above, there is some small degree of similarity between the disclosures of the Collins patent and the claims of the '577 patent. Collins discloses the use of a multi-block copolymer hot melt adhesive to bond non-woven material to polyethylene. The Court finds, however, that this similarity does not render the Collins patent anything more than marginally material.

Prior art or information is not material if "it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO." *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987). In its application, National cited references describing the bonding of a non-woven to a polyethylene through application of a block copolymer hot melt adhesive. National cited United States Patent 3,239,478 (the Harlan patent) in Group I of its disclosed references. Plaintiff's Exh. 24 at 23. The Harlan patent teaches application of an A–B–A block copolymer hot melt adhesive for bonding polyethylene and non-woven fabrics. *See* Plaintiff's Exh. 801 at Col. 3, Lines 48–56, Col 6, Lines 63–68. National also cited United States Patent 4,419,494 (the Puletti patent) which discusses use of A–B–A copolymer adhesives to bond leg band elastic to polyethylene in the construction of disposable diapers. *See* Plaintiff's Exh. 64, Col. 8, Lines 8–14. National further cited United States Patent 4,147,-580 (the Buell patent) which describes construction of disposable diapers including bonding of a non-woven to a substrate through a pattern (*e.g.* multi-line) application of hot melt adhesive. *See* Defendant's Exh. 100. In light of the above references, the Court finds the Collins patent to be

---

5. In the face of this obvious conclusion, the testimony of former patent examiner Hamrock that a reasonable examiner would have considered the multiple lines on a Collins-type sanitary napkin to be multi-line construction is plainly without credibility and will not be accepted by the Court.

immaterial or at most marginally material to National's application for the '577 patent.

### 2. *Intent*

■ Questions of materiality and intent are closely intertwined in that the less material the proffered or withheld information, the greater the degree of intent that must be proven. *See American Hoist,* 725 F.2d at 1363. When prior art or information is merely instructive as to the general character of a proposed invention, and would not be crucial to the decision of a reasonable examiner not to reject an application, more than gross negligence or recklessness is required to prove inequitable conduct. *See American Hoist,* 725 F.2d at 1363. Given the Court's finding that the Collins patent is only marginally material to National's application for the '577 patent, Fuller must show a relatively high degree of intent to prevail. The Court finds that Fuller has failed to carry this burden of proving intent. In fact, Fuller has failed to demonstrate that National's nondisclosure of the Collins patent resulted from gross negligence, the minimum threshold level of intent.

■ Intent need not be proven with direct evidence. *Atlas Powder,* 750 F.2d at 1578. It may be proven by showing acts the material consequences of which are presumably intended by the actor. *J.P. Stevens,* 747 F.2d at 1560; *Atlas Powder,* 750 F.2d at 1578. Fuller asserts that National patent agent Ellen Dec knew well the teachings of the Collins patent and the applicability of that patent to National's application for the '577 patent. Fuller contends that Dec's failure to disclose the Collins patent was grossly negligent and should cause the Court to infer an intent on the part of Dec to mislead the PTO. Fuller further contends co-inventor Paul Puletti knew of the applicability of the Collins patent and was at least grossly negligent in failing to insure its disclosure to the PTO.

Fuller argues that both Dec and Puletti were familiar with the teachings of the Collins patent and intentionally or negligently withheld it despite its relevance. In support of this argument, Fuller notes that in an earlier lawsuit between National and Fuller concerning the Collins patent, both Dec and Puletti served as in-house contacts for National's outside counsel. *See* Tr. 1423. Fuller asserts that as a research scientist actively involved in overseeing hot melt adhesive development, Puletti was skilled in the technology underlying the Collins patent and thus should have recognized the applicability of its disclosures. Dec cited the Collins patent as prior art in National's application for a patent on a PET bottle constructed with hot melt adhesive and so was well versed in the teachings of Collins, Fuller contends. *See* Tr. 1483–84; Plaintiff's Exh. 661.

The Court finds that while Dec and Puletti had some knowledge of the teachings of the Collins patent, neither believed it to be particularly applicable to National's claims under the '577 patent. Clearly, neither Dec nor Puletti, nor any National employee involved with the '577 patent application, intentionally withheld the Collins patent while believing it to be a relevant reference. Further, given the obvious distinctions between the Collins disclosures and the multi-line construction described in the patent in suit, the Court cannot conclude that Dec or Puletti was grossly negligent in failing to include Collins in the '577 patent application.

The testimony of Puletti, which the Court found highly credible and enlightening, clearly illustrates his belief that Collins taught an adhesive construction fundamentally different from that involved in the '577 patent. Puletti testified that he recognized the Collins patent purely as a positioning adhesive patent. Tr. 1006. Puletti stated that at the time of National's application, he was not aware of the construction aspect of the Collins patent. Tr. 1006–07. Puletti further stated that he did not consider the Collins patent to be relevant to multi-line construction. Tr. 1007.

The Court finds without a doubt that Puletti did not intentionally suppress the Collins patent. In fact, at the time Puletti participated in the application process, he never even considered the Collins patent.

Tr. 1007. Furthermore, as evidenced by the testimony cited above, Puletti's judgment as to the relevance of the Collins patent to the '577 patent application comports with the Court's finding as to materiality; *i.e.*, that the Collins patent taught an adhesive construction significantly different from, and therefore largely immaterial to, the claims of the '577 patent. Accordingly, the Court finds that Puletti had no reason to include the Collins patent as a prior art reference and thus was not grossly negligent in failing to insure its disclosure.

As for National patent agent Dec, another witness whom the Court found very believable, the Court finds that neither her involvement in the Collins patent litigation nor her previous citation of the Collins patent in applying for the PET bottle patent leads to the inescapable conclusion that Dec suppressed the Collins patent intentionally or as a result of gross negligence. On the contrary, Dec's highly credible testimony leads the Court to the opposite conclusion, *i.e.*, that Dec did not act improperly in failing to include the Collins patent as a prior art reference.

There is absolutely no evidence that Dec withheld the Collins patent in an attempt to mislead the PTO. Dec testified, quite believably, that the Collins patent did not come to mind as an appropriate reference at the time she prepared the prior art statement accompanying National's application. Tr. 1381. Fuller attempts to impeach this testimony by showing that Dec previously cited Collins in another patent concerning hot melt adhesive construction. Tr. 1483; Plaintiff's Exh. 661. Yet given the large number of existing hot melt adhesive patents, citing a reference for one adhesive application and not another is quite understandable. As noted by Fuller in United States Patent 4,259,220 (the '220 patent): "Research activity in the field of hot melt pressure-sensitive adhesives has been very extensive, and even a representative citation of references drawn from this field would be difficult to provide." Defendant's Exh. 70, Col. 2, Lines 16–20.

It is clear that mere awareness that prior art is "relevant" in some general sense does not mandate a finding of requisite intent. *See American Hoist*, 725 F.2d at 1362. As the Court has already concluded, the Collins patent was little more than simply relevant to the '577 patent application. While the Collins patent teaches an adhesive of the type disclosed in the claims of the '577 patent, and used in the construction of a disposable article, sufficient other references describing that adhesive construction were included to fully brief the PTO regarding its properties. The Court finds that National patent agent Dec was not grossly negligent nor did she act with an intent to mislead the PTO in failing to disclose the Collins patent.

## B. *Kraton 1111 Data*

### 1. *Materiality*

National filed its original patent application on January 9, 1984. Included in that application was a summary of test results collected under the heading "Example II."[6] This example demonstrated the superiority

---

**6.** Example II of National's application provides in relevant part:

Using the general procedure described in Example I, other adhesives were prepared using various block copolymers in place of the Stereon 840A. The adhesive compositions were subjected to the Adhesion Failure test, Adhesive Strength Test and Static Time to Failure test.

| Block Copolymer | Peel Pass/Fail Degrees Fahrenheit | Adhesive Strength | Static Time to Failure |
|---|---|---|---|
| Adhesive A | 135/140 | 8 pli | 7 hrs. |
| Kraton Gl652 | 125/130 | 5 pli | 48 hrs. |
| Kraton 1102 | 115/120 | 7 pli | 8 hrs. |
| Kraton 1107 | 100/110 | 7 pli | 3 hrs. |

As seen from the above results, while the adhesive strength was comparable, the heat resistance of the composition containing Kraton 1107 (a styrene-isoprene block copolymer) was substantially poorer than that obtained using the styrene-butadiene copolymers of the present invention. Further, while the Kraton Gl652 containing adhesive possessed some superior properties, the economic considerations involved together with the overall satisfactory properties of compositions prepared with the Stereon 840A, make these latter compositions the preferred adhesives for use herein.

in terms of heat resistance of the claimed preferred embodiment over other adhesives including those based on S–I–S copolymers (specifically Kraton 1107).[7] The results portrayed in the example were drawn from research conducted by National in the course of developing the adhesive claimed in the '577 patent.

Omitted from Example II were the results of tests National performed on Kraton 1111, an isoprene-based adhesive. *See* Plaintiff's Exh. 30 at 5. These results indicated that Kraton 1111 (and inferentially all S–I–S adhesives) have acceptable heat resistance.[8] So interpreted, the results cast doubt on correctness of National's assertions in Example II.

Fuller argues that the undisclosed Kraton 1111 test data was highly material to the patent examiner's decision to allow the '577 patent. Fuller contends that had the examiner known that S–I–S adhesives demonstrated acceptable heat resistance, the examiner would not have approved National's amended application. Fuller thus contends the omitted data satisfies the stringent "but for" test of materiality. In support of its materiality argument, Fuller cites the language of the communications which transpired between National and Fuller during the application process.

National's original application for the patent in suit was rejected by the PTO in a First Office Action issued July 23, 1984. In that rejection, patent examiner James C. Cannon stated:

> In view of the known practice of using hot melt A–B–A copolymers as adhesives for PE layers used in disposable diapers (Puletti) and the known utility of applicants' compositions as adhesives for PE films and non-woven fabrics (Harlan), it is not seen that at the time of applicants' invention it would have been unobvious to one of ordinary skill in the art to have used the hot melt, pressure-sensitive adhesives of Harlan to adhere a PE non-wo-

ven layer to a PE film layer in the production of disposable diapers.

Plaintiff's Exh. 24 at 45. Thereafter, National submitted an amendment to the patent application seeking to distinguish National's invention from the prior art. In that amendment, National patent agent Dec argued: (1) that the Puletti reference describes a "construction technique [which] is not the same as, nor are the requirements thereof related to, those of a multi-line construction adhesive;" and (2) that the Harlan reference "is general in its scope and includes many adhesives which applicants have shown in their examples not to be suitable for the specific end use involved here." Plaintiff's Exh. 24 at 49. Dec further stated that the "adhesives prepared using the isoprene midblock copolymers are illustrated in applicants' Example II as giving substantially poorer and commercially unacceptable results with respect to . . . heat resistance." *Id.* The patent examiner responded to this amendment by allowing the patent to issue, stating:

> The specificity of applicants' application of adhesive, the breadth of the Puletti and Harlan disclosures, and the non-utility of many of the adhesives disclosed in said references for applicants' purposes are convincing of the patentability of applicants' claims over the Puletti and Harlan disclosure.

Plaintiff's Exh. 24 at 54.

Fuller's argument in favor of a finding that the Kraton 1111 data was highly material to National's application may be simply stated as follows. In the amendment National filed which resulted in allowance of the '577 patent, Dec distinguished the Harlan prior art in part by pointing to the poor heat resistance of isoprene adhesives demonstrated by National's Example II. In allowing the '577 patent to issue, the examiner relied on the Example II data, stating that patentability arose from "the non-utility of many of the adhesives disclosed in [the prior art] . . . for applicants' pur-

---

**7.** This superiority is specifically illustrated by a comparison of the relative peel pass/fail values of Adhesive A (the preferred embodiment) vis-a-vis Kraton 1107 (an S–I–S copolymer).

**8.** In its testing, National recorded a peel pass/fail value of 125/130 for Kraton 1111. *See* Plaintiff's Exhibit 30 at 5.

poses...." Plaintiff's Exh. 24 at 54. Fuller contends that had the examiner been provided with the Kraton 1111 data, he would not have found isoprene adhesives to be without utility and accordingly would not have allowed the patent.

The Court does not agree with Fuller's characterization of the materiality of the Kraton 1111 data as meeting the but for standard. Fuller's suggested finding of materiality results from an unduly narrow reading of both National's amendment and the examiner's comments on that amendment; a reading which is not supported by the evidence presented in this case. Accordingly, the Court cannot adopt Fuller's proposed finding of fact for materiality.

Fuller's argument presumes that the non-utility of isoprene adhesives was crucial to the examiner's decision to allow the '577 patent. In other words, Fuller argues that had the examiner believed isoprene adhesives perform as well as butadiene adhesives in heat resistance tests, the examiner would not have allowed the patent. To reach this conclusion, Fuller relies on a statement made by the examiner in allowing the patent. The examiner stated:

> The specificity of applicants, application of adhesive, the breadth of the Puletti and Harlan disclosures, and the nonutility of many of the adhesives disclosed in said references for applicants purposes are convincing of the patentability of applicants' claims over the Puletti and Harlan disclosures.

Plaintiff's Exh. 24 at 54. Fuller argues that because the reasons given by the examiner were stated conjunctively, each reason was necessary for the examiner's allowance of the patent. Accordingly, Fuller contends that the Kraton 1111 data which impugns the validity of one of those reasons was highly material to National's application for the '577 patent.

Although the examiner stated his reasons for allowing the '577 patent conjunctively, Fuller has not shown that non-utility of S–I–S adhesives was a necessary component of the allowance decision. That is, Fuller has not demonstrated that the other reasons stated by the patent examiner were insufficient to render National's invention patentable. Fuller's materiality argument ignores the part of the examiner's amendment which states that *"[t]he specificity of applicants' application of adhesive,* [and] *the breadth of the Puletti and Harlan disclosures* ... are convincing of the patentability of applicants' claims over the Puletti and Harlan disclosures." Plaintiff's Exh. 24 at 54 (emphasis added). Yet the evidence suggests that these reasons played a large role in the examiner's decision to allow the patent.

The evidence presented by both sides at trial demonstrates conclusively that the adhesive application described in the '577 patent is a highly specific application to which a small range of adhesive compositions are best suited. To best serve the requirements of a multi-line constructed diaper, an adhesive must, among other things, possess a high degree of adhesion and demonstrate security and flexibility, yet said adhesive must not absorb through the actual diaper construction upon application. Neither the Harlan nor the Puletti patent deals specifically with the adhesive construction described in the patent in suit. For example, Harlan, while providing a detailed discussion of block copolymer adhesives which may be used to bond polyethylene to nonwoven, does not discuss the special adhesive requirements of multi-line construction. Similarly, Puletti describes an improved block copolymer adhesive for use in diaper construction, but specifically refers not to multi-line, but to an adhesive construction used to bond elastics to polyethylene surfaces thus creating a diaper leg band. Therefore, neither Harlan nor Puletti deals with the specific adhesive application presented in the '577 patent.

Further, the evidence shows that Harlan and Puletti are considerably broader in scope than the claims of the '577 patent. Both Harlan and Puletti deal generally with A–B–A type block copolymer adhesives and neither specifically anticipates the narrow embodiment described in the '577 patent. Fuller has failed to show that the specificity of National's invention and the breadth of prior disclosures were

unimportant to the patent examiner and that correspondingly the non-utility of other adhesives was critically important to allowance of the patent.

■ Although the preceding discussion demonstrates that the Kraton 1111 data does not meet the but for test of materiality, the evidence presented at trial suggests that the Kraton 1111 was somewhat material to National's application for the '577 patent. In several recent decisions, the Federal Circuit has noted that the standard set forth in PTO Rule 1.56(a) is the appropriate starting point for any determination of materiality, in that the PTO standard most closely aligns with how one ought to conduct business with the PTO. *American Hoist*, 725 F.2d at 1362; *J.P. Stevens*, 747 F.2d at 1559; *Akzo*, 810 F.2d at 1153. The PTO standard states that information is material where there is:

a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

37 C.F.R. § 1.56(a); *American Hoist*, 725 F.2d at 1362.

The materiality of the Kraton 1111 data arises from the fact that, while the unacceptable heat resistance of isoprene glues was by no means the sole argument advanced by National in its amendment and cited by the examiner in his allowance, it was stressed in establishing the patentability of National's invention. National specifically alluded to its Example II, and relied on it in part to distinguish the preferred adhesive embodiment from less suitable isoprene-based alternatives. *See* Plaintiff's Exh. 24 at 49. Further, while the examiner broadly referred to the "non-utility" of other unclaimed adhesives without specifically mentioning heat resistance, certainly heat resistance is one of the components of the examiner's finding. *Id.* Accordingly, because it is likely that the examiner considered heat resistance values to be somewhat important in deciding to allow National's application, the omitted contradictory Kraton 1111 heat resistance data meets the threshold standard for materiality.

## 2. *Intent*

■ Inequitable conduct is not established "upon a mere showing that art or information having some degree of materiality was not disclosed." *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411 (Fed.Cir. 1987). As stated by the Federal Circuit in *FMC Corp.*, 835 F.2d at 1415:

To be guilty of inequitable conduct, one must have intended to act inequitably.

Thus in order to prove inequitable conduct, one must show that the patentee intended to mislead the PTO or acted with gross negligence demonstrating an intent to mislead. Gross negligence is present when the actor knew or should have known of the materiality of withheld information. *J.P. Stevens*, 747 F.2d at 1560.

Fuller contends that Dec, Schmidt and Puletti, individually and together, acted with an intent to mislead the PTO or were grossly negligent in failing to include the Kraton 1111 data in National's patent application. Fuller thus argues that the requisite level of intent exists for the Court to find the '577 patent invalid based on National's inequitable conduct. The Court finds, however, that Fuller has not established the requisite level of intent by clear and convincing evidence. After carefully observing and thoroughly reviewing the testimony of the alleged wrongdoers, the Court finds that neither Dec, Schmidt nor Puletti acted with an intent to mislead the PTO in failing to disclose the Kraton 1111 data. Further, the Court finds insufficient evidence of gross negligence from which to infer an intent to mislead the PTO. The Court finds Dec, Schmidt and Puletti to be credible witnesses and the Court places great weight upon their testimony. That testimony shows that Dec, Schmidt and Puletti upheld the duty of candor imposed on all patent applicants and exercised sufficient care in filing National's application and amendment for the '577 patent.

To be liable for inequitable conduct, an "[a]pplicant must be chargeable with knowledge of the existence of the prior art or information, for it is impossible to disclose the unknown." *FMC Corp.*, 835 F.2d

at 1415.[9] However, an applicant cannot avoid learning of information through gross negligence. *See FMC Corp.*, 835 F.2d at 1415. In the case at bar, it is clear that National patent agent Dec was not cognizant of the Kraton 1111 data during the application process. Tr. 1391, 1401.[10] Further, the Court finds that Dec was not grossly negligent in failing to learn of the Kraton 1111 data and include it in National's application or amendment.

Nothing in her consultations with inventors Schmidt and Puletti notified Dec of the existence of the Kraton 1111 data. Further, the Kraton 1111 data was but one piece of data among the myriad of data discussing many adhesive formulations which were displayed in National's laboratory reports. Given these circumstances, the Court finds that Dec was not grossly negligent in failing to note the Kraton 1111 data. Additionally, the Court finds that in completing the '577 application and amendment, and specifically in assembling the data in Example II and discussing its implications, Dec acted in good faith.[11] In her communications with the PTO, Dec did no more than permissibly attempt to distinguish National's claimed invention from the prior art. In so doing, Dec did not carelessly construe the available test data, but rather made her best argument in favor of the patentability. Moreover, to the extent that Dec's nondisclosure of the Kraton 1111 data resulted from failure to adequately check her work with the inventors, Dec's actions constitute at most simple negligence and are thus insufficient to establish intent. *J.P. Stevens*, 747 F.2d at 1560.

As to the inventors of the '577 patent, Schmidt and Puletti, the Court finds the evidence insufficient to warrant a finding of intent, either from deliberately mislead-ing conduct or as a result of gross negligence. First, the Court finds Fuller's attempt to weave a theory of intentional misconduct to be implausible. While it is true that Kraton 1111 test data demonstrating the acceptable heat resistance of isoprene adhesives was compiled but not disclosed to the PTO, this nondisclosure did not result from an attempt to falsely demonstrate patentability by skewing disclosed test results. Rather, the nondisclosure occurred because of the inventors' decision to discontinue testing S–I–S adhesives due to the thermal instability of such adhesives. Tr. 1218, 1279. The Kraton 1111 data was not focused upon by the inventors, and no evidence of intentional suppression exists. The Court finds Fuller's narrow interpretation of isolated laboratory reports insufficient to support a finding of intent.

Fuller also has failed to prove by clear and convincing evidence gross negligence on the part of Schmidt or Puletti. While the evidence suggests that perhaps Schmidt and Puletti failed to attend meticulously to details of the patent prosecution, the evidence does not approach the level necessary to satisfy the clear and convincing standard. Moreover, based on its judgment of the credibility of the inventors' testimony describing their actions in prosecuting the patent, the Court finds that Schmidt and Puletti acted in good faith and did not disregard their duty of candor. Accordingly, the Court finds insufficient intent to support a finding of inequitable conduct with regard to the Kraton 1111 data.

### C. Thermal Degradation

The evidence presented at trial shows that in defining the scope of their invention, National's Schmidt and Puletti exclud-

---

9. The term "applicant" includes the patentee and the agent who prosecuted the application resulting in the patent in suit; the knowledge of actions of applicant's agent are chargeable to applicant. *See FMC Corp.*, 835 F.2d at 1415, n. 8, *citing Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*, 759 F.2d 10, 14–15 (Fed.Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985).

10. In fact, Dec stated that had she known about the data she would have disclosed it to the PTO. Tr. 1478–79.

11. A party's subjective good faith in prosecuting a patent application properly plays a role in the Court's determination of intent. *See FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521, 555 (Fed.Cir.1987).

ed S–I–S adhesives largely due to the thermal instability of such adhesives. Tr. 1218. Their belief, supported by the evidence, was that S–I–S adhesives degrade during the prolonged heat exposure common in the diaper manufacturing process. This degradation results in a thinning of the adhesive and correspondingly poor performance. Although thermal degradation of S–I–S adhesives may be prevented by use of a nitrogen blanket during processing, diaper manufacturers are unwilling to use such protective measures in their manufacturing plants. Tr. 1010–11, 1219.

Fuller contends that National committed inequitable conduct by failing to disclose information about thermal degradation relevant to the patent application. Fuller argues that if the real reason National rejected S–I–S adhesives was the need for a protective nitrogen blanket, National should have disclosed that reason to the PTO. In the absence of such full disclosure, Fuller contends the '577 patent should be unenforceable.

■ Materiality is not to be viewed in a vacuum, and isolated nondisclosures must be evaluated in light of the entire set of references disclosed to the PTO. It is well accepted that a patent applicant does not have a duty to disclose all possible relevant information. As stated by the Federal Circuit in *American Hoist:*

> Reverting to the court's recitation of a "duty to disclose all facts pertinent to the prosecution of an application," it is also clear that an applicant for patent is under no obligation to disclose "all pertinent prior art or other pertinent information" of which he is aware.

*American Hoist,* 725 F.2d at 1362, *citing Digital Equipment Corp. v. Diamond,* 653 F.2d 701, 716 (1st Cir.1981). Non-material, merely speculative references need not be disclosed and failure to disclose such references will not result in a finding of inequitable conduct. *Rolls–Royce Limited v. GTE Valeron Corp.,* 800 F.2d 1101, 1107 (Fed.Cir.1986).

In arguing for a finding of inequitable conduct, Fuller asserts that National acted wrongly by failing to disclose information showing the need for a nitrogen blanket to prevent thermal degradation in S–I–S adhesives. In fact, National made such a disclosure. The disclosure statement submitted by National as part of its patent application includes as a Group II reference, technical literature describing the properties of Stereon 840A. *See* Plaintiff's Exh. 24 at 23. That literature discusses the use of a nitrogen blanket to protect hot melt adhesives and illustrates the significant problem of thermal degradation in unprotected S–I–S adhesive. Plaintiff's Exh. 24 at 31–32. The literature further summarizes test results showing that thermal degradation was "most pronounced" in S–I–S adhesives. Plaintiff's Exh. 24 at 32. The patent examiner evaluating National's application, James Cannon, initialed the Stereon reference indicating his reading and review of its thermal stability discussion. Plaintiff's Exh. 24 at 25.

In an attempt to discount the value of National's Stereon disclosure and its effect on the patent examiner's decision to allow the '577 patent, Fuller relies in part on the testimony of William Hamrock, a former patent examiner in the hot melt area. This reliance is misplaced, however, because Hamrock's testimony displayed questionable credibility at best. For example, while staunchly defending his own thoroughness in examining patents, Hamrock insisted that he read every reference before signaling completion of his review by initialing the reference. Tr. 651. Yet Hamrock suggested that examiner Cannon initialed the references contained in National's application, including the Stereon reference, without reading or considering them. Tr. 649. Hamrock thus attempted to show that Cannon did a poor job in evaluating National's application and could have been easily duped by National's alleged inequitable conduct.

■ The Court will not accept Hamrock's implied indictment of the patent office. Throughout trial, counsel for Fuller assured the Court that Fuller had the utmost faith in the PTO. Yet through the testimony of Hamrock, Fuller attempted to portray the patent examiner as a bungler,

incapable of competent, independent investigation. The Court may not delve into the mental processes of the examiner, but must objectively judge the material the examiner considered through National's disclosures and the examiner's written reports and acknowledgements. Reviewing those communications, the Court finds that National presented ample material prior art to the examiner regarding the thermal instability of S–I–S adhesives. In this regard, no material references were withheld or mischaracterized and accordingly no claim of inequitable conduct may survive on this ground.

### D. *Conclusion*

Based on the foregoing discussion, the Court finds that National did not procure the '577 patent through inequitable conduct. Accordingly, National's patent is not invalid nor unenforceable.

## V. INFRINGEMENT

National has filed a counterclaim seeking recovery for alleged infringement of the '577 patent. National contends that disposable diaper manufacturers used Fuller's adhesive HM–1979 in constructing multi-line diapers which infringe the '577 patent. National further contends that Fuller induced this infringement by promoting HM–1979, an adhesive falling within the claims of the '577 patent, for use in multiline diapers, and by indemnifying manufacturers against damages resulting from any lawsuit brought for infringement of the '577 patent. National thus claims Fuller is liable for infringement and seeks compensation for Fuller's alleged wrongful conduct. In light of the Court's finding that the '577 patent is not invalid for inequitable conduct, the Court must determine the merits of National's infringement counterclaim.

 Title 35 U.S.C. § 271 defines patent infringement as follows:

(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

No difference in remedy exists for violations of subsections (a) and (b). That is, one who induces infringement is treated for liability purposes exactly as one who directly infringes. *See Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 481 (Fed. Cir.1985); P. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. 1, 53 (West 1954).

 Establishing an inducement of infringement requires proof of two elements: (1) an act by the defendant knowingly calculated to induce another to infringe, and (2) the actual culmination of the defendant's acts in a direct infringement by another. *See, e.g., Mixing Equipment Co. v. Innova–Tech, Inc.*, 2 U.S.P.Q.2d 1212 (E.D. Pa.1986) [available on WESTLAW, 14541]. The Court finds that the evidence at trial conclusively establishes the existence of both inducement of another to infringe, and direct infringement by another. Accordingly, the Court finds Fuller liable for infringement of the '577 patent.

 As to the latter element, direct infringement by another, the first important piece of evidence is defendant's exhibit 6. Defendant's exhibit 6 is a Fuller document describing its adhesive product HM–1979. This product information sheet includes the formula for HM–1979 and lists its ingredients and relative percentage weights in the product composition. An examination of the stated formula for HM–1979 reveals that it falls within the patented adhesive composition described in claim 4 of the '577 patent.

| Claim 4 | HM–1979 |
|---|---|
| (a) 15 to 35% by weight of an A–B–A–B–A–B– multi-block copolymer wherein the A component is styrene and the B component is butadiene and wherein the styrene component is present in an amount of at least 35 parts per 100 | HM–1979 contains 19.1% of Stereon 840 which is an A–B–A–B–A–B multi-block copolymer which contains 43 parts styrene per 100 parts polymer. |

| Claim 4 | HM–1979 |
|---|---|
| (b) 45 to 70% by weight of a compatible tackifying resin; | HM–1979 includes 54.4% of Zonatac 501 Lite as a tackifying resin. |
| (c) 5 to 30% by weight of a plasticizing oil; | HM–1979 includes 22.5% of NH–120 as a plasticizing oil. |
| (d) 0 to 5% by weight of a petroleum derived wax; and | HM–1979 does not use any wax (0% in the claimed range). |
| (e) 0.1 to 2% by weight of a stabilizer. | HM–1979 employs .5% Irganox 1076 and 0.5% Butyl Zimate both stabilizers to a total of 1%. |

*See* Defendant's Exh. 6; Plaintiff's Exh. 24 at 27; Tr. 1302–03, 1757–58.

██ The invention described in claim 4 of the '577 patent is not limited to an adhesive composition. Rather, claim 4 describes "[a] disposable article of the multi-line type construction comprising at least one polyethylene or polypropylene substrate bonded to at least one tissue, nonwoven, polyethylene or polypropylene substrate using a hot melt pressure sensitive adhesive composition...." Plaintiff's Exh. 10, Col. 8, lines 55–59. Fuller admitted in pretrial discovery that "if a manufacturer of a disposable diaper were to use Fuller's HM–1979 for the construction application specified in Claims 1 and 4, the resulting diaper would be covered by those claims." Tr. 1304. Thus, to establish the element of direct infringement by another, National has the burden of showing that a disposable diaper manufacturer used HM–1979 for multi-line construction of disposable diapers. The Court finds that National has carried its burden of proof on this issue, but only with respect to multi-line diapers manufactured by Weyerhaeuser. Although National presented some evidence suggesting other manufacturers, namely Chicopee, Scott Paper, Medical Disposables and American Personal Products, used HM–1979 in the multi-line construction of disposable diapers, that evidence is insufficient to establish direct infringement by those companies.[12]

Perhaps the most persuasive evidence of Weyerhaeuser's infringing use of Fuller's HM–1979 in the multi-line construction of disposable diapers is the simple and straightforward admission of Fuller. In its second request for admissions, National included the following request:

Subsequent to July 12, 1985, HM–1979 was used by Weyerhaeuser for the manufacture of multi-line constructed diapers.

Fuller responded:

It is admitted that Weyerhaeuser used the glue for that application and others.

Tr. 1304. The evidence of direct infringement by Weyerhaeuser is not limited, however, to Fuller's admission. For example, the testimony of Stephen Price, manufacturing manager for Weyerhaeuser, reveals that HM–1979 was used by Weyerhaeuser for the multi-line construction of disposable articles. Tr. 1654.[13] Further, the testimony of Fuller sales representative John Peplinski confirmed that Fuller sold HM–1979 to Weyerhaeuser for use in a multi-line constructed disposable diaper. Tr. 1623. In sum, substantial evidence was presented to show direct infringement of the '577 patent by Weyerhaeuser.[14]

12. To prove direct infringement by the above named manufacturers, National relied solely on testimony by Fuller sales representatives who sold HM–1979 and Fuller sales records. This evidence was too inspecific to serve as the sole basis for a finding of infringement. By comparison, the formal admission by Fuller (discussed *infra*) that Weyerhaeuser employed HM–1979 in an infringing use is highly probative evidence on direct infringement.

13. Fuller objects to Price's testimony on this point, and asks the Court to strike the testimony because it lacks foundation. Fuller argues that Price had no basis for stating that Weyerhaeuser used HM–1979 for multi-line construction of disposable articles.

The Court finds, however, that Price's testimony regarding this matter is competent and based on an adequate foundation. Accordingly, the Court hereby overrules the objection.

14. Infringement of any one of several claims is sufficient to create liability for infringement. Although the preceding discussion has been limited to Fuller's infringement of claim 4 of the '577 patent, the evidence establishing that infringement is also sufficient to create liability for infringement of claims 1, 5, 10 and 11. The multi-line constructed disposable diapers manufactured by Weyerhaeuser using Fuller's HM–1979 fall within the language of these claims.

The mere fact that Fuller sold a component of an infringing product is insufficient by itself to warrant liability for inducing infringement. *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528–29, 92 S.Ct. 1700, 1707, 32 L.Ed.2d 273 (1972). To prove inducement of infringement, National must establish that Fuller acted in a manner knowingly calculated to induce its customers to infringe. *See Mixing Equipment*, 2 U.S.P.Q.2d 1212 (E.D. Pa.1986). Fuller can be liable for inducing infringement only if it successfully encouraged diaper manufacturers to directly infringe. As discussed above, Weyerhaeuser directly infringed the '577 patent by manufacturing multi-line disposable diapers constructed with Fuller's HM–1979 adhesive. The Court finds that Weyerhaeuser's infringement is a direct result of Fuller's actions. Without question, Fuller caused and encouraged Weyerhaeuser to infringe; Fuller therefore is liable for inducing infringement under 35 U.S.C. § 271(b).

In reaching the above conclusion, the Court finds Fuller's indemnification letter to be persuasive evidence. On August 16, 1985 Fuller sent a letter to Weyerhaeuser's director of quality control which included the following paragraph:

> By this letter, it is agreed that the H.B. Fuller Company will indemnify you from damages as a result of any lawsuit brought against you for infringement of U.S. patent 4,526,577 with respect to your use of H.B. Fuller product number HM–1979 used in the multi-line construction of diapers.

Defendant's Exh. 51. The letter stated that indemnification was granted at Weyerhaeuser's request, thus inferring that it was a requirement for continued use of HM–1979 by Weyerhaeuser. That inference was confirmed by the testimony of Weyerhaeuser's manufacturing manager Stephen Price who stated, "if we couldn't get an indemnification, we wouldn't purchase the product." Tr. 1690.[15] Further, Fuller vice president James Collins testified that he believed Weyerhaeuser would not deal with Fuller absent the indemnification. Tr. 1843–44. Thus it is clear that Weyerhaeuser's infringement arose through the actions of Fuller.

The indemnification provided Weyerhaeuser by Fuller is not the sole evidence of Fuller's inducement. The testimony of Fuller sales personnel indicates that Fuller actively encouraged Weyerhaeuser to use HM–1979 in the multi-line construction of disposable diapers. Tr. 1623, 1653–54, 1759–60. Fuller sales personnel made numerous calls on Weyerhaeuser's diaper manufacturing plants for the purpose of promoting HM–1979 for multi-line use. In short, Fuller induced Weyerhaeuser to manufacture an infringing product.

Fuller contends that National has failed to prove inducement by failing to introduce specific evidence that Weyerhaeuser manufactured infringing multi-line diapers after the date of the indemnification letter. Fuller argues that without such evidence, the Court cannot determine whether the indemnification letter was a *successful* attempt to encourage Weyerhaeuser to directly infringe. Fuller further argues that without such date-specific evidence, its admission that Weyerhaeuser used HM–1979 for multi-line construction is nonprobative.

The Court finds that National presented sufficient evidence indicating the time period of direct infringement by Weyerhaeuser to support a finding of inducement of infringement against Fuller. Fuller's indemnification letter was sent to Weyerhaeuser on August 16, 1985. National presented evidence that a *substantial* number of sales of HM–1979 to Weyerhaeuser occurred after that date. *See* Defendant's Exh. 103, 114. Further, as discussed above, the indemnification letter was required by Weyerhaeuser in order for it to continue purchasing HM–1979. This evidence, along with Fuller's admission that Weyerhaeuser used HM–1979 to manufacture an infringing diaper, are convincing of Fuller's liability for inducing infringement.

---

**15.** To the extent that Fuller objects to Price's testimony regarding Weyerhaeuser's insistence on indemnification, that objection is overruled.

## VI. DAMAGES

Title 35 U.S.C. § 284 provides in relevant part:

> Upon finding for the claimant [patent owner] the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

Courts have generally construed section 284 to allow a patentee to establish damages by either proving lost profits or by proving the reasonable royalty for use of the patented invention. *See, e.g., Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed.Cir.1983). In the case at bar, National has not sought damages based on lost profits but rather seeks to recover a reasonable royalty for the use of its patented invention.

■ There is no required method for determining a reasonable royalty. *See TWM Manufacturing Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed.Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986) (court has discretion in choosing analytical approach to determine reasonable royalty). Typically a court will determine a reasonable royalty rate and apply that rate to the infringer's infringing sales to reach an appropriate damages figure. *See, e.g., Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1518 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). The reasonable royalty *rate* is determined by examining what a willing licensor and willing licensee would have agreed upon during hypothetical negotiations. *See Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1561 (Fed.Cir.1983). The factors bearing on this hypothetical negotiation were set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *mod.*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971), and have been applied in numerous cases thereafter. *See, e.g., Railroad Dynamics*, 727 F.2d at 1518. Among these factors are:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

. . . .

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

. . . .

14. The opinion testimony of qualified experts.

. . . .

*Georgia–Pacific*, 318 F.Supp. at 1120.

### A. Royalty Base

Not surprisingly, the parties have reached widely disparate results in calculating a reasonable royalty based on the facts present in the case at bar. This disparity results in large part from the different royalty *bases* advocated by the respective parties. National argues that a reasonable royalty is 2½ percent of Weyerhaeuser's sales of infringing multi-line *diapers*. Conversely, Fuller contends that an appropriate royalty is 3–4 percent of the sales price of Fuller's HM–1979 *adhesive* employed by Weyerhaeuser in infringing multi-line diapers. Resolution of this dispute as to the proper royalty base is a necessary starting point for determining a reasonable royalty.

National vigorously argues that the proper royalty base is the sales of infringing *diapers* by Weyerhaeuser. In so arguing, National asserts that the royalty base is defined by the claims of the patent in suit. National therefore contends that because the '577 patent claims a multi-line *diaper* and not merely a hot melt adhesive used in the construction thereof, the appropriate royalty base is the sales of infringing diapers.

National bases its argument for a royalty of 2½ percent of infringing diaper sales on its construction of 35 U.S.C. §§ 271(b) and 284. National contends that Fuller is liable for inducing infringement under sec-

tion 271(b), which states that "[w]hoever actively induces infringement of a patent shall be liable *as an infringer.*" 35 U.S.C. § 271(b) (emphasis added). National thus argues that Fuller's liability is dependent on Weyerhaeuser's direct infringement. With this dependent liability in mind, National cites section 284 and argues that it should be awarded "in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. National argues, moreover, that since Weyerhaeuser is the infringer, then the "use made of the invention" must be the use made by Weyerhaeuser, and such use should be the base for calculating damages. Then, going back to section 271(b), National contends that as one liable as an infringer, Fuller is liable for damages as if it were the direct infringer. The effect of National's argument is that the "liability" imposed on inducers under section 271(b) is calculated based on the actual, direct infringement.

The reasonable royalty calculation resulting from National's argument is a remarkably high figure.[16] National's claimed royalty would equal almost double Fuller's total *revenue* from sales of HM–1979 to Weyerhaeuser and is many times Fuller's profit on those sales. National argues, however, that this figure represents an appropriate damage award to remedy Fuller's wrongful acts.

In arguing for a reasonable royalty based on diaper sales, National overlooks the primary goal of 35 U.S.C. § 284—compensation. Section 284 states that "the court shall award the claimant damages adequate *to compensate for the infringement.*" (Emphasis added.) Dis-

cussing this policy of compensation, the Supreme Court has said:

[T]he present statutory rule is that only "damages" may be recovered. These have been defined by this Court as "compensation for the pecuniary loss he [the patentee] has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts." *Coupe v. Royer,* 155 U.S. 565, 582 [15 S.Ct. 199, 206, 39 L.Ed. 263 (1895)]. They have been said to constitute "the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." *Yale Lock Mfg. v. Sargent,* 117 U.S. 536, 552 [6 S.Ct. 934, 942, 29 L.Ed. 954 (1886)]. The question to be asked in determining damages is "how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder–Licensee have made?" *Livesay Window Co. v. Livesay Industries, Inc.,* [251 F.2d 469, 471 (5th Cir.1958)].

*Aro Manufacturing Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964); *see also General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 654–55, 103 S.Ct. 2058, 2061–62, 76 L.Ed.2d 211 (1983).

In determining a reasonable royalty, the Court cannot divorce itself from economic reality. The evidence submitted at trial attested to the competitiveness of both the diaper and adhesive industries. Given this competitiveness, it is wholly unrealistic for National to claim its losses approximate a royalty of 2½ percent of *diaper* sales.[17] Such a royalty would

---

16. Application of National's royalty theory results in the following reasonable royalty calculation:

| | |
|---|---:|
| Pounds of HM–1979 sold to Weyerhaeuser | 626,447 |
| Diapers per pound of adhesive | × 454 |
| Diapers sold | 284,406,938 |
| Wholesale price per diaper | × .177 |
| Total Sales ($) | $ 50,340,028 |
| Royalty rate | × .025 |
| Total royalty | $ 1,258,500 |

17. As noted by the Federal Circuit in *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1562 (Fed.Cir. 1983):

[T]he quantum of [the patentee's] recovery for an infringing [device] does not depend on whether [the user] or [the manufacturer] is the defendant. Rather, it depends on what royalty reasonably would have resulted from negotiations where a willing licensor was aware that [the manufacturer] would make and [the user] would use the [device].

Thus, in the case at bar, it makes no difference for purposes of a reasonable royalty whether

price any adhesive or diaper manufacturer out of the market. Thus it is unreasonable to consider such a royalty in the hypothetical license scenario.

Further, compelling evidence presented at trial indicates that *adhesive* sales are the proper base for computing a royalty in the diaper adhesive market. For example, both licenses issued by National under the '577 patent were based on sales of adhesive. *See* Plaintiff's Exh. 143 at 5 (Findley Adhesives License); Defendant's Exh. 39 at 5 (Kodak License). Similarly, the licenses taken by Fuller and National from Hilliard–Lyons in connection with settlement of the Collins patent litigation (which similarly claimed a disposable article utilizing hot melt adhesive) were based on adhesive sales. Tr. at 896–97.

The evidence at trial thus indicates that adhesive sales are the appropriate royalty base in the case at bar. As noted above, the key purpose of any reasonable royalty damage calculation is to *compensate* the patent holder. The Court's determination of adhesive sales as the proper royalty base thus accords with the Court's finding of what is necessary compensation. In other words, the Court finds that a royalty calculated on adhesive sales will properly remedy the harm suffered by National as a result of the infringement of the '577 patent.

One other dispute as to the royalty base exists between the parties. Fuller contends that National has failed to prove the amount of HM–1979 used by Weyerhaeuser for infringing purposes. In the absence of such proof, Fuller contends, National cannot recover damages based only on Fuller's sales.

In support of its argument, Fuller relies on the testimony of its sales personnel who stated that Weyerhaeuser used Fuller's HM–1979 adhesive for applications other than multi-line construction. For example, Fuller sales representative Thomas Wagner testified that in addition to multi-line, Weyerhaeuser used Fuller's HM–1979 for end seam construction and attachment of

elastic leg bands. Tr. 1769. Also, William Cox, Fuller's former business manager for non-wovens, testified that Weyerhaeuser purchased HM–1979 for use as a multi-purpose diaper adhesive. Tr. 1735. Fuller also notes that some of the HM–1979 adhesive is wasted and does not end up being used in infringing multi-line diapers. Tr. 1694–95.

■ The Court finds this evidence insufficient to prevent National from recovering a royalty on all of Fuller's sales of HM–1979 to Weyerhaeuser. As noted previously, Fuller formally admitted that Weyerhaeuser used HM–1979 for multi-line construction. Tr. 1304. While Fuller indicated that HM–1979 was used in other adhesive applications, Fuller provided no direct proof that HM–1979 was diverted from multi-line use. The testimony of Fuller's sales personnel is at best inconclusive and does not sufficiently negate the inference that Weyerhaeuser employed HM–1979 for *multi-line* construction of disposable diapers.

■ The above conclusion is reinforced by the well-established principle that any uncertainty as to damages from infringement should be resolved in favor of the patent owner. As stated by the Supreme Court in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931):

Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which

the hypothetical licensor is an adhesive formulator or a diaper manufacturer. The critical

question is what damage National suffered as the result of infringement of its '577 patent.

he alone is responsible for making, were otherwise.

Thus, in proving damages, "the patent owner's burden of proof is not absolute, but rather one of reasonable probability." *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 653 (Fed. Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985), *citing Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983). Here, National has established with reasonable probability that Weyerhaeuser used Fuller's HM–1979 adhesive for infringing purposes. Because Fuller induced this infringement and therefore is the wrongdoer, Fuller cannot complain that uncertainty as to damages eliminates Fuller's liability. On the contrary, Fuller's unquestioned promotion of HM–1979 for multi-line use renders it liable for a reasonable royalty based on its sales of that adhesive to Weyerhaeuser occurring after August 16, 1985.[18]

### B. *Royalty Rate*

In determining a reasonable royalty rate, the Court must apply the pertinent *Georgia–Pacific* factors set forth above.

#### 1. *Established Royalty*

National has issued two licenses to adhesive manufacturers based on the '577 patent. On March 5, 1986, National executed a nonexclusive license with Findley Adhesives for sale of adhesive used in multi-line products falling within the claims of the '577 patent. Plaintiff's Exh. 143. That license provided for a royalty of four percent on the sales price of the claimed adhesive. On March 26, 1987 National executed a similar license with Eastman Kodak which set forth a sliding scale royalty computed as follows:

| Net Sales for each Accounting Year | Royalty |
| --- | --- |
| up to $3,000,000 | 7.0% |
| $3,000,000—$6,000,000 | 6.0% |
| More than $6,000,000 | 5.0% |

*See* Defendant's Exh. 39 at par. 3.01.

▮▮▮▮ An established royalty rate is used in a case in which prior negotiated

royalties to the time of infringement are: (a) paid by sufficient persons to indicate the reasonableness of the rate, (b) uniform, (c) not paid under threat of litigation, and (d) are for comparable rights under the patent. *Studiengesellschaft Kohle m.b.H. v. Dart Industries, Inc.*, 666 F.Supp. 674, 680 n. 6 (D.Del.1987), *citing Rude v. Westcott*, 130 U.S. 152, 165, 9 S.Ct. 463, 468, 32 L.Ed. 888 (1889), and *Faulkner v. Gibbs*, 199 F.2d 635, 638 (9th Cir.1952). The licenses cited above are insufficient to prove an established royalty as they were entered into after this litigation began and are tainted by this litigation. However, the licenses provide some indication of an appropriate license rate to be paid on adhesive sales falling within the '577 patent.

#### 2. *Comparable Licenses*

As previously discussed, the Collins patent claims a sanitary napkin constructed with a hot melt adhesive. Prior to the instant lawsuit, Fuller and National were involved in litigation over the Collins patent. In that suit, Fuller sought damages for infringement while National challenged the validity of the Collins patent. The lawsuit involving the Collins patent ended in 1985 in a settlement between the parties. As a condition of that settlement, Fuller sold the Collins patent to a patent management firm, Hilliard–Lyons, which in turn issued licenses to both Fuller and National. Tr. 896; Plaintiff's Exh. 847–A, 847–B. Under the terms of those licenses, Fuller and National each agreed to pay a royalty of 5.5 percent of the net sales price of the claimed hot melt adhesive. Tr. 896–97; Plaintiff's Exh. 847–A at 5, 847–B at 6.

The rough similarity between the Collins patent settlement and the case at bar suggests that the 5.5 percent royalty rate is probative of a reasonable royalty rate here. Yet because the Collins settlement terms embodied not only business judgment re-

---

**18.** This is the date on which Weyerhaeuser received the indemnification letter from Fuller. Because Fuller is liable only for the infringement it induced, and because the indemnifica-

tion letter was the most significant act of inducement, only sales occurring after that date relate to actionable infringement. Thus the royalty base shall be adjusted accordingly.

garding the value of the Collins patent but also compromised claims of infringement and invalidity, the settlement royalty rate is not definitive evidence of the proper royalty here. Nonetheless, the Collins royalty agreements provide some evidence of a reasonable royalty.

### 3. *Profitability*

■ The profitability and success of a product made under the patent play a role in the Court's reasonable royalty calculation. The evidence presented at trial established that Fuller enjoyed a ten percent net profit on the sales of HM–1979 as of the summer of 1985. Tr. 1836. Fuller expected this net profit margin to increase to fifteen percent upon reaching expected sales volume. Tr. 1836. This margin would be applied to expected annual sales of $10 million. Tr. 1852. The evidence further indicated that National enjoyed a much higher profit margin on sales of its comparable adhesive. Tr. 1840. Moreover, National's product was and is being sold in high volume to major diaper manufacturers. Tr. 993, 991. Thus, the profitability and commercial success of adhesives falling within the claims of the '577 patent suggest a higher reasonable royalty is necessary to compensate National.

### 4. *Expert Testimony*

The Court finds the testimony of neither party's expert to be persuasive on the subject of reasonable royalty. National's expert, Cruzan Alexander, testified based on his experience in negotiating product licenses that a reasonable royalty regarding the '577 patent would fall midway between one and four percent of infringing diaper sales. Tr. 1537–38. Alexander based his opinion on his belief that more than ninety percent of the nonexclusive patent licenses negotiated in this country have royalty rates between one and four percent. Tr. 1537. Yet when questioned closely, Alexander exhibited little knowledge about the diaper adhesive industry and provided no factual basis for his royalty figure. In fact, commenting on Alexander's testimony, National makes the rather incredible claim that "[t]he applicable royalty rate

here ... is between 1 and 4%—because it almost always ... is." National Post Trial Memorandum at 46. Clearly, such an opinion is insufficient to support National's royalty theory.

The testimony of Fuller's expert, John Starr, is not much more helpful to the Court's reasonable royalty analysis. Starr testified that a reasonable royalty would be three to four percent of sales of the claimed adhesive. Tr. 827. While Starr's opinion was based in part on his experience in the nonwoven products industry, the opinion was premised largely on factors known to the Court and readily understandable by an ordinary lay person. For example, Starr took into account the Findley and Kodak licenses under the '577 patent, the licenses executed by Fuller and National as a result of the Collins patent litigation settlement, the competitiveness of the diaper and adhesive industries, and the profitability of multi-line adhesives. Tr. 819–21, 851. All of these factors were fully explained to the Court, and have been considered by the Court in its reasonable royalty analysis.

■ After careful consideration of all the factors, the Court finds that a reasonable royalty between willing parties would be six percent of the net sales of multi-line adhesive employed in diapers within the claims of the '577 patent. However, as explained in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir.1978):

> The setting of a reasonable royalty after infringement cannot be treated ... as the equivalent of ordinary royalty negotiations among truly "willing" patent owners and licensees. That view would constitute a pretense that the infringement never happened. It would also make an election to infringe a handy means for competitors to impose a "compulsory license" policy upon every patent owner.

> Except for the limited risk that the patent owner, over years of litigation, might meet the heavy burden of proving ... lost profits, the infringer would have nothing to lose and everything to gain if he could count on paying only the nor-

mal, routine royalty non-infringers might have paid. As said by this court in another context, the infringer would be in a "heads-I-win, tales-you-lose" position.

(Citations omitted.) *See also Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed. Cir.1983); *Medtronic, Inc. v. Catalyst Research Corp.*, 547 F.Supp. 401, 415 (D.Minn.1982). The Federal Circuit has emphasized that an award of damages under the reasonable royalty theory must be adequate to compensate for the infringement. *Stickle*, 716 F.2d at 1563. Thus, the Court has the discretion to increase the reasonable royalty award to accomplish that compensatory purpose. *Stickle*, 716 F.2d at 1563.

In the case at bar, the testimony of Fuller's vice president James Collins illustrates that in deciding to infringe the '577 patent, Fuller clearly believed itself to be in a no-lose situation.[19] Tr. 1850–55. Collins testified that outside of the inconvenience and expense of litigation, Fuller believed it faced only the possibility of paying a royalty of approximately four percent of adhesive sales as a consequence of its infringing conduct. Tr. 1857–58. Such a royalty, Collins testified, would approximate the license fee Fuller would be required to pay if it took a license from National under the '577 patent. *Id.* Clearly, a royalty of four percent would not adequately compensate National for Fuller's infringement. Similarly, a royalty rate of six percent is artificially low and does not reflect the reality of the damage suffered by National. Therefore, after careful consideration of all the facts and the law, the Court has concluded that a reasonable royalty rate of nine percent is neces-

sary to adequately compensate National for Fuller's infringement.

## VII. WILLFULNESS

 National contends that Fuller willfully infringed the '577 patent and is thus subject to an award of increased damages. Pursuant to 35 U.S.C. § 284, upon a finding of willfulness, "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284; *see Rite–Hite Corp. v. Kelley Co.*, 819 F.2d 1120 (Fed.Cir.1987). Willfulness is a question of fact, and the party that asserts willfulness must prove its case by clear and convincing evidence. *Shatterproof Glass Corp. v. Libby–Owens Ford Co.*, 758 F.2d 613, 628 (Fed.Cir.), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985).

The Federal Circuit has held that a potential infringer "has an affirmative duty to exercise due care to determine whether or not he is infringing." *Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1389–90 (Fed.Cir.1983). When judging whether an infringer has adequately discharged that duty, the Court is to evaluate the "totality of the circumstances." *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 867 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). In making this evaluation,

> there cannot be hard and fast *per se* rules. The district court, considering the evidence before it and the testimony and demeanor of the witnesses, must in each case determine whether an infringer has discharged its affirmative duty of exercising due care.

---

**19.** Collins' testimony is instructive on the attitude of Fuller in forging ahead with the sale of a product with little concern for the consequences if it should later develop that patent infringement was involved:

> Q. All right. Mr. Collins, we will put the patent aside. And apparently, as the discussion, the sense of the discussion was going, one of the consequences of going ahead indemnifying, continuing to sell, as you viewed it, was that if National called it into question and you ended up in litigation over it, you didn't want to be in litigation; that if you

went through that litigation and lost, why somebody would penalize Fuller with a license at a rate that really wasn't substantially different than what it would pay if it signed up anyway, is that the way you felt?

> A. That was certainly one of the feelings. Yeah, that was one of them, yes.

Tr. at 1852. While Collins attempted to retreat somewhat from that answer in later testimony, the Court had the strong feeling that the quoted question and answer fully captured Fuller's attitude in its sale of the questioned product.

*Rolls–Royce, Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1110 (Fed.Cir.1986).

■ Whether a potential infringer consults competent counsel regarding infringing activities, while not solely determinative of willfulness, plays a role in the analysis of due care. As stated in *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1579 (Fed.Cir.), *modified in part on other grounds,* 231 U.S.P.Q. 160 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987):

> Though it is an important consideration, not every failure to seek an opinion of competent counsel will mandate an ultimate finding of willfulness. Conversely, that an opinion of counsel was obtained does not always and alone dictate a finding that the infringement was not willful.

(Citations omitted.) *See also Rolls–Royce,* 800 F.2d at 1109–10.

■ The evidence in the present case clearly and convincingly demonstrates that Fuller willfully infringed the '577 patent. Fuller received notice of the '577 patent by letter from National dated July 12, 1985. That letter explicitly notified Fuller of the infringing nature of its sales of HM–1979 to diaper manufacturers.

> Recent analysis of certain of your products indicate that at least one of your hot melt adhesives sold to diaper manufacturers using multi-line construction, falls within the scope of the adhesive recited in the claims of this patent.
>
> If you contend that your sales of such hot melt adhesives to diaper manufacturers for use in their multi-line constructed diapers does not infringe this patent please let us know as soon as possible.

Plaintiff's Exh. 625. In response to this notice, Fuller did not stop its sales of HM–1979 to Weyerhaeuser. In fact, Fuller failed even to check outgoing shipments to determine the extent of its exposure. Tr. 1152–54. Instead, shortly after receiving National's letter, Fuller issued a blanket indemnification to Weyerhaeuser for use of its HM–1979 adhesive in multi-line constructed disposable diapers.[20] Defendant's Exh. 51.

Fuller did circulate National's letter and the '577 patent among some of its technical and business personnel. Tr. 907. Yet the testimony reveals that no thorough investigation was conducted. Rather, Fuller decided, based upon generalized beliefs, not to stop its infringing conduct.

Fuller sought an opinion from outside counsel regarding the '577 patent, and Fuller's outside patent counsel conducted an apparently thorough investigation leading to its opinion of invalidity. But the testimony presented at trial demonstrates that the decision to continue infringing was made before the opinion letter issued on October 15, 1985. This is an important point underlying the Court's finding of willfulness. The Collins patent, upon which Fuller's technical personnel based their opinions regarding the validity of the '577 patent, was the subject of litigation between Fuller and National. Given the intense business and technical rivalry between these two companies, it is unlikely that Fuller employees could objectively examine the claims of National's patent. In such a situation, the opinion of outside counsel was important to ensure due care is taken with respect to possible infringement. However, Fuller did not wait for that opinion before acting. Tr. 944–45, 1851–52. Fuller proceeded to indemnify Weyerhaeuser without benefit of objective evaluation. Fuller did not rely on counsel's opinion, but merely used it to ratify its willful infringement. Such action is not

**20.** Fuller's method of issuing the letter of indemnification to Weyerhaeuser is instructive as to Fuller's intent in its use of the adhesive. The indemnity letter (1) was not written by an attorney; (2) was not reviewed by any attorney before it was sent, including Susan Marrinan, Fuller's in-house counsel; (3) was sent to Weyerhaeuser before any legal opinion as to the validity of the '577 patent had been received from Fuller's patent counsel; (4) was written by Bill Cox, who is described in the letter as Fuller's "Business Manager, Non-woven Industries" and was not read by Cox after it was typed; and (5) was signed by Cox's secretary. The Court concludes that the adage "damn the torpedoes, full speed ahead" was in full force and effect at Fuller in connection with its sale of the adhesive to Weyerhaeuser.

consonant with the requirement of due care.

The Court finds that the decision to indemnify Weyerhaeuser was based more on business reasons than on any good faith belief regarding the potential invalidity of the '577 patent. On this point, the testimony of Fuller vice president James Collins is most revealing. Collins testified that in deciding to indemnify Weyerhaeuser, Fuller took a calculated business risk. *See* Tr. 1852. Fuller managers apparently believed that even if they continued to induce infringement and were later penalized for that infringement, the royalty imposed as damages would not be substantially different than a license fee negotiated in the summer of 1985. *See* Tr. 1852. Therefore, Fuller managers decided to continue promoting HM–1979 to Weyerhaeuser for use in multi-line diapers in derogation of National's rights embodied in the '577 patent. Fuller thus deliberately and willfully ignored National's patent rights.

In making its finding of willfulness, the Court is mindful of the policies behind multiplied damages expressed by the Federal Circuit in *Rite–Hite Corp. v. Kelley Co.*, 819 F.2d 1120, 1126 (Fed.Cir.1987). In that case, the court stated:

> The role of a finding of "willfulness" in the law of infringement is partly as a deterrent—an economic deterrent to the tort of infringement—and partly as a basis for making economically whole one who has been wronged....

*Rite–Hite*, 819 F.2d at 1126. The court went on to note:

> The measure of damages ... provides an opportunity for the trial court to balance equitable concerns as it determines whether and how to recompense the successful litigant.

*Rite–Hite*, 819 F.2d at 1126, *quoting S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 781 F.2d 198, 201 (Fed.Cir.1986).

The Court's finding of willfulness in the present case reflects its assessment of the equities involved. It is clear to the Court that in indemnifying Weyerhaeuser, Fuller acted with little regard for National's established patent rights. This finding is based, in part, on the Court's assessment of the credibility of Fuller's vice president Collins and general counsel Marrinan. The Court finds that the claims of due care presented by these witnesses are not credible. Specifically, with regard to Collins, who was largely responsible for the decision to indemnify Weyerhaeuser, the Court finds that he acted deliberately and callously in approving Fuller's continued infringement. Further, by carelessly issuing a broad indemnification prior to receiving opinion of outside counsel, Fuller failed to exercise due care.

▪▪▪ Based on the foregoing, the Court finds Fuller's infringement willful, and in light of the circumstances described herein the Court has determined that the actual damages shall be increased by an assessment of fifty percent.

## VIII. PREJUDGMENT INTEREST

In *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983), the Supreme Court held that under the patent damages statute, 35 U.S.C. § 284, "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award." The Court in *General Motors* cited undue delay by a patent owner in prosecuting an infringement action as one possible basis for withholding an award of interest. *General Motors*, 461 U.S. at 657, 103 S.Ct. at 2063. Seizing on this statement, Fuller argues that National should be denied an award of prejudgment interest because National failed to institute an infringement action immediately after notifying Fuller of its infringing conduct in July 1985.

▪▪▪ The Court finds no evidence that National in any way delayed prosecution of this lawsuit. Undue delay should not be confused with prudent, deliberate action in the face of patent infringement. The Court refuses to deny an award of prejudgment interest based on National's failure to immediately bring suit for infringement. Patent holders are entitled and indeed should be encouraged to attempt resolution

of infringement claims outside the legal process. Accordingly, National will be awarded prejudgment interest.

 Three points must be addressed regarding calculation of the interest award. First, as stated in *General Motors*, 461 U.S. at 655–56, 103 S.Ct. at 2062, prejudgment interest on a reasonable royalty should be calculated from "the time that royalty payments would have been received." Here, it is reasonable to assume that Fuller would have made monthly royalty payments to National based on its shipments of HM–1979 to Weyerhaeuser. Accordingly, interest should be calculated from the last day of the month of each shipment starting with the first shipment made after the date of the indemnification letter.

 Second, the Court notes that prejudgment interest is awarded to the patent owner for the purpose of making him whole. *General Motors*, 461 U.S. at 656, 103 S.Ct. at 2062. It is awarded to compensate for the delay in the payment of damages and not to punish the infringer. *Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1389 (Fed.Cir.1983). Accordingly, prejudgment interest can only be applied to the actual damage portion and not to the punitive or enhanced portion. *Id.* Therefore, although the Court finds Fuller's infringement willful and will increase damages based on that finding, prejudgment interest shall be calculated on the actual damages determined by a reasonable royalty.

 Third, the amount of any award of prejudgment interest is within the Court's discretion. *General Motors*, 461 U.S. at 656–57, 103 S.Ct. at 2063. Thus the Court is free to fix the appropriate interest rate and may select an award at the prime rate. *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d at 1066; *cf. General Facilities, Inc. v. National Marine Service, Inc.*, 664 F.2d 672, 674 (8th Cir.1981). In the case at bar, the Court directs that the prime rate applicable at the end of the month in which a shipment was made shall be the proper rate from which to determine prejudgment interest.

Based on the foregoing, and upon all the files, records, proceedings and arguments of counsel,

IT IS ORDERED AND ADJUDGED that

1. United States Patent No. 4,526,577 is not invalid for inequitable conduct;

2. Fuller has induced infringement of United States Patent No. 4,526,577 and is liable for an award of damages based on that inducement of infringement;

3. National is entitled to judgment against Fuller on its infringement counterclaim;

4. Fuller shall pay National damages based on a reasonable royalty of nine percent of Fuller's sales of HM–1979 to Weyerhaeuser occurring after August 16, 1985;

5. Fuller's infringing conduct with respect to United States Patent No. 4,526,577 was willful and warrants a 50 percent increase in damages;

6. Fuller shall pay National prejudgment interest calculated as set forth herein; and

7. Fuller's complaint is dismissed with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.