exists which precludes a grant of summary judgment.

YOUNG DENTAL MANUFACTURING
CO., Plaintiff,

v.

Q3 SPECIAL PRODUCTS, INC.,
David G. Kraenzle and Chris
J. Carron, Defendants.

No. 4:93CV2319SNL.

United States District Court,
E.D. Missouri,
Eastern Division.

July 14, 1995.

**1346**

Joseph F. Devereux, Jr., Devereux and Murphy, Clayton, MO, for plaintiff.

Rudolph A. Telscher, J. Bennett Clark, Senniger, Powers, Leavitt & Roedel, St. Louis, MO, for Q3 Special Products, Inc., David G. Kraenzle, Chris J. Carron.

### MEMORANDUM

LIMBAUGH, District Judge.

Plaintiff has filed this multi-count action alleging that the defendants have infringed its patent on a disposable prophy angle (DPA), misappropriated certain confidential proprietary information and trade secrets, engaged in constructive fraud; and that defendant Kraenzle has breached a Proprietary Agreement with the plaintiff. The defendants have counterclaimed challenging the validity of the plaintiff's patent at issue in this lawsuit. This matter is before the Court on defendant Carron's motion for summary judgment as to Counts I, II, and III of the complaint (defendant Carron is not named in Count IV of the complaint). Responsive pleadings have been filed. This cause of action is set for jury trial on the Court's trial docket of September 11, 1995.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mt. Pleasant v. Associated Elec. Coop. Inc.*, 838 F.2d 268, 273 (8th Cir.1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."

*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts relevant to the instant motion.

Defendant Carron worked for Young Dental from April 1988 to May 1992, first as a machinist, then as a CAD/CAM systems operator[1]. He terminated his employment with plaintiff and engaged full-time employment in June 1992 as a sales/applications engineer for Dynamic Machine Tools.[2] In July 1992, he and defendant Kraenzle formed Q3 Special Products, Inc. Defendant Kraenzle was the majority shareholder and president; Carron was the remaining minority shareholder and secretary. At the formation of this business venture, Carron owned 120 shares (out of 300 shares issued) of Q3 stock,

---

[1] CAD stands for "computer-aided drafting" and CAM stands for "computer-aided manufacturing".

[2] Carron maintained full-time employment with Dynamic Machine Tools throughout the relevant time period.

constituting 40% of the business. In 1993, additional shares of stock were issued (400 shares issued in total) and Carron's ownership of 120 shares constituted 30% of the business. In 1994, Carron gave up ownership of a large number of shares; he retained ownership of twenty-four (24) shares, constituting 6% of the business.

When Carron departed plaintiff's place of business, he took with him a personal file containing miscellaneous employee benefits documents, and one document marked "Confidential".

In connection with his involvement with the operations of Q3, defendant Carron has loaned money to Q3, approximately totalling $17,000.00. He has purchased, on request of Kraenzle, a small amount of cloth, ground steelplates, and component parts ostensibly for cup molds. On one occasion he assisted his brother Nick with the transportation of a press to Kraenzle's residence. When Kraenzle inquired about someone suitable to manufacture parts for Q3's DPA, Carron recommended Perry Machine and Die, Inc. After Kraenzle hired Perry Machine and Die, Inc., Carron advised their employees as to appropriate software for the manufacture of prophy cups and provided training to Perry's employees in the use of this software.

Defendant Carron contends that he cannot be liable for patent infringement because he has not made, used, or sold the accused device; nor has he sold any components of Q3's DPA; and finally, nor has he induced any third party to infringe plaintiff's patent. Carron further contends that he has not taken, used, or disclosed any of the plaintiff's trade secrets or confidential information. Plaintiff contends that Carron's involvement with Q3's DPA goes beyond just merely being an investor. It further contends that Carron did induce Perry Machine & Die, Inc. to infringe plaintiff's patent by hiring it to make prophy cups for Q3's DPA. Finally, plaintiff contends that Carron did misappropriate confidential information by removing a "confidential" document from plaintiff's premises and that he disclosed proprietary information by providing Perry with the CAD/CAM software identical to plaintiff's software, and then training Perry's people to use it in order to manufacture prophy cups for Q3's DPA.

The Court has carefully reviewed the parties's pleadings and submitted exhibits and determines that no genuine issues of material facts exist regarding defendant Carron's lack of infringing activity or activity designed to induce infringement by a third party; or that he has not taken and utilized confidential information or trade secrets in his activities following his departure from plaintiff's employment.

Title 35 U.S.C. § 271 defines patent infringement as follows:

(a) Except as otherwise provided in this title, whoever, without authority makes, uses, or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever sells a component of a patented machine, manufacture combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

■ Plaintiff fails to present any evidence indicating that defendant Carron directly infringed the '547 Patent. It fails to dispute in any manner Carron's deposition testimony that he had no involvement with the design of Q3's DPA, did not make any drawings for the design of the accused angle, did not participate in the development of the manufacturing process for the accused angle, did not participate in the installation or implementation of computer-aided design drawings for the Q3 angle, did not play any role in testing the Q3 angle, and did not contribute to the design and cutting of mold inserts or mold cups for the Q3 DPA. Deposition of Chris Carron, Vol II, pgs. 7–16, 20–22, 42, 43–45. It is undisputed that he did not participate in any sales of the Q3 DPA. Carron Deposition, Vol. II, pg. 56.

Plaintiff further fails to offer a shred of evidence that Carron is liable for contributory infringement. It offers nothing to contradict Carron's sworn declaration that he has never sold any components of the Q3 DPA. Carron Declaration, Paragraph 6.

■ Essentially, the focus of the plaintiff's opposition to Carron's motion is that he is liable for inducement of infringement pursuant to § 271(b). Plaintiff avers that Carron was "instrumental" in the selection of Perry Machine & Die as the manufacturer of the Q3 prophy cup molds, and that his crucial role is demonstrated by the fact he provided Perry's employees with plaintiff's CAD/CAM linking software and trained Perry's employees in the use of this software. Plaintiff further points to the fact that Carron purchased, on Kraenzle and Q3's behalf, certain materials used in the manufacture of prophy mold cups.

■ An inducement of infringement requires proof of two elements: 1) an act by the alleged defendant knowingly intended to induce another to infringe; and 2) the actual infringement by the third party. *H.B. Fuller Co. v. National Starch and Chemical Corp.*, 689 F.Supp. 923, 943 (D.Minn.1993). Thus, there is no liability for inducement of infringement unless an actual infringement in violation of § 271(a) occurs. *Zenith Labs. v. Bristol–Myers Squibb Co.*, 19 F.3d 1418, 1423 n. 5 (Fed.Cir.1994); *Joy Technologies v. Flakt*, 6 F.3d. 770, 774 (Fed.Cir.1993); *The Procter & Gamble Co. v. Nabisco Brands, Inc.*, 604 F.Supp. 1485, 1487 (D.Del.1985). Furthermore, the accused infringer must be shown to have had actual knowledge of the patent and the actual intent to induce the infringement. *Dynamis, Inc. v. Leepoxy Plastics*, 831 F.Supp. 651, 657 (N.D.Ind. 1993); *Procter & Gamble v. Nabisco*, at 1487.

It is well-established that "corporate officers who actively aid and abet their corporation's infringement may be personally liable for inducing infringement under § 271(b) regardless of whether the corporation is the alter ego of the corporate officer." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed.Cir.1986); *New Hampshire Ins. Co. v. R.L. Chaides Construction Co.*, 847 F.Supp. 1452 (N.D.Cal.1994); *Dow Chemical Co. v. Eby Mine Service*, 813 F.Supp. 749 (D.Col.1993); *A. Stucki Co. v. Buckeye Steel Castings*, 795 F.Supp. 847, 851 (S.D.Ohio 1991). Furthermore, "where the officer or director has directed or ordered the infringing method of manufacture or has controlled the sale of the infringing goods, he is jointly liable with the corporation for patent infringement without regard to his specific intent or knowledge." *A. Stucki Co.*, at 851 *quoting A. Stucki Co. v. Schwam*, 634 F.Supp. 259, 264 (E.D.Pa.1986).

Plaintiff contends that Carron engaged in certain activities designed to induce both his corporation and Perry Machine & Die to infringe after he was made aware of the existence of the patent application for what is now known as the '547 Patent. Section 271(b) requires direct infringement, and direct infringement is the violation of an issued patent. Consequently, "mere knowledge that an application for a patent is pending is not sufficient to constitute the knowing and intentional inducement required for a violation of section 271(b)." *Procter & Gamble v. Nabisco*, at 1488. Young Dental has provided no evidence showing that Carron knew that a patent would issue and that plaintiff's patent claims would cover Q3's DPA. The undisputed fact is that at some point in time Carron observed markings on Young Dental's DPA indicating that a patent was pending. Carron's Deposition, Vol. II, pgs. 60–61. Plaintiff offers nothing to dispute the fact that Carron did not know of the issuance of the patent until he was notified of this fact by Young Dental's attorneys in a letter dated August 16, 1993. Carron's activities associated with Q3 occurred over nine (9) months prior to his notification of the issuance of the '547 Patent. Plaintiff's own list of incriminating activities designed to induce infringement shows that the last of these activities occurred in September 1992 when Carron helped his brother transport a press allegedly used to make prophy cup molds. Plaintiff fails to identify any activity post-issuance of the '547 Patent which demonstrates inducement of infringement by Carron. On the contrary, after the date of the notice, Carron's stock ownership dropped from 40% to 30% to finally just 6%. Conse-

quently, plaintiff's own evidence indicates that Carron could not have acted with the required knowledge and intent at the time of the incriminating acts.

Furthermore, all of the acts cited by the plaintiff, i.e. purchase of certain items and the transportation of the press, relate to the prophy mold or cup. The '547 Patent, as well as the plaintiff's complaint, only covers the disposable prophy angle, not the prophy cup attachment. Plaintiff's own evidence shows that whatever active involvement Carron may have had with Q3, it was primarily limited to the prophy cups, not the disposable prophy angle.

Finally, plaintiff contends that inducement of infringement is demonstrated by Carron's "instrumental" involvement with Perry Machine & Die. Plaintiff offers no evidence to dispute Carron's sworn testimony that all he did was suggest to Kraenzle that Kraenzle contact Perry Machine. Plaintiff offers no evidence to dispute Carron's testimony that he did not interview Perry Machine nor make the decision to use Perry Machine for injection molding. Carron Deposition, Vol. II, pg. 22. Finally, plaintiff offers no evidence to support its allegation that Carron assisted Perry in the purchase of CAD/CAM linking software identical to plaintiff's software. All Carron admitted to doing was assisting Perry with training of its employees on Perry's CAD/CAM system. Carron Deposition, Vol. II, pgs. 63–64. Plaintiff offers no evidence that Perry's system was in fact identical to plaintiff's system or that Perry's CAD/CAM system was used to assist it in the development of the prophy cup molds for Q3's DPA.

Plaintiff offers nothing but accusations and broad general allegations that Carron induced both Q3 and Perry Machine to infringe the '547 Patent. It offers no evidence, by affidavit or otherwise, to controvert the fact that whatever minimal activity Carron engaged in was solely related to the prophy cup molds and that such acts occurred prior to his actual knowledge of the issuance of the '547 Patent. Plaintiff offers no evidence which would persuade a reasonable jury that Carron knew of the '547 Patent and actively participated in acts designed to induce in-

fringement of the patent. Summary judgment, as to Count I, will be granted to defendant Carron.

■ As to Count II, defendant Carron asserts that he has not taken, used, or disclosed any Young Dental trade secrets or confidential information. He testified at his deposition that all he took, when he left the plaintiff's employ, was his own personal file containing employee benefits documents and one document marked "Confidential".

A basic problem that the defendants, as well as the Court, has with Count II of plaintiff's complaint, is its broad and general allegations regarding misappropriation of trade secrets and confidential information. The complaint fails to identify with any particularity the nature of the trade secrets and confidential information allegedly taken and used by the defendants. In fact, at his deposition, Dental Young's President, G. Richmond, could not identify a single trade secret or piece of confidential information that he was aware of that defendant Carron had taken or used.

Q. In paragraph seventeen it is stated that, "On or about May 22nd, 1992, defendant Carron"—for the record, I believe that's Chris Carron—'resigned his employment with plaintiff and thereafter became employed by Q3. When he resigned Carron surreptitiously removed or caused to be removed proprietary design, know-how, trade secrets, and technical and sales information from plaintiff's premises.'

What is your belief as to what Mr. Carron surreptitiously removed or caused to be removed in the way of proprietary design, know-how, trade secrets, and technical and sales information?

A. I have no specific information as to what defendant Carron removed. It was hoped that during the lawsuit we would find out what if any he did remove.

Q. You were present for parts of the deposition of Mr. Kraenzle, were you not, Mr. Richmond?

A. Yes, I was.

Q. Were you present for part of the deposition of Chris Carron as well?

A. Yes.

Q. Did you hear anything in those depositions that caused you to further believe that Mr. Kraenzle or Mr. Carron surreptitiously removed or caused to be removed this trade secret information from your premises?

A. No.

Q. Do you have—Has anybody at Young Dental or anyplace else ever had personal knowledge of any written information of any type that was taken by Mr. Carron or Kraenzle in—What I'm getting at here, has anybody ever told you, "Mr. Richmond I saw Mr. Kraenzle taking out a book, a document," or "I heard he says he is going to take some documents," or anything at all in that nature?

A. No. The only thing I'm aware of is the one document that was marked confidential that was I believe in Chris Carron's file.

Q. Like a market plan?

A. Right.

Q. But you're not aware of any other statements or claims made by someone at Young Dental that they witnessed the taking of documents or—

A. No, sir. I am not aware of any such thing.

Q. Are you aware of any statements— Start over. Are you aware of anybody at Young Dental who claims that Mr. Kraenzle or Mr. Carron or anybody else made statements to the effect that Mr. Kraenzle is going to use Young Dental information to compete with it or Mr. Carron is going to use confidential information or anything of that nature?

A. No, sir. I'm not aware of any of that.

Q. And is there anything other that what you have testified to so far that leads you to believe that Carron or Kraenzle have used any of the design, know-how, trade secrets, or any other confidential information whatsoever that they learned while at Young Dental?

A. No.

Q. Do you have any information that any present or former Young Dental employee has removed information from Young Dental at the request of or to give to Mr. Kraenzle or Mr. Carron?

A. No.

Deposition of G. Richmond, Vol. II, pgs. 101, 103–104, 113–114.

In its response to the instant summary judgment motion, plaintiff, for the first time, alludes to particular proprietary information allegedly taken and used by Carron. It accuses Carron of obtaining and using plaintiff's CAD/CAM linking software to train Perry Machine employees for the benefit of Q3; and that Carron utilized plaintiff's "trade secrets" relating to cup mold designs and cup molding techniques.

At his deposition, Carron testified that the CAD/CAM software that he utilized at Young Dental had been purchased at a retail commercial computer software establishment. Carron Deposition, Vol. I, pgs 158–60. He read the accompanying documentation, and spoke with third-party computer specialists about linking the software. Carron Deposition, pgs. 161–62. Plaintiff fails to explain or identify this software as being specifically developed for use at Young Dental. It fails to offer any evidence to rebut Carron's sworn testimony that this software had been purchased at a retail commercial computer software store open to the public. It is a completely frivolous contention on plaintiff's part to assert that publicly sold software that Carron adapted for use at Young Dental is plaintiff's proprietary information.

Furthermore, plaintiff offers no evidence that this software was actually used to produce the mold drawings for the Kraenzle DPA as plaintiff assert.

■ The other "trade secret" identified by plaintiff in its response to the instant motion concerns its method and molds for making prophy cups (the rubber cup attached to the phophy angle). The rubber cups are produced by compression molding. Plaintiff offers no evidence that its method of compression molding is a trade secret; i.e., that it is done in a method different from standard industry methods or even different from Q3's method. Although Mr. Richmond was unable to identify a single trade secret or piece of confidential information taken and used by

Carron on Q3's behalf, he identified Ron Bailey as someone who could identify these "surreptitiously" obtained pieces of proprietary information. Richmond Deposition, Vol. III, pg. 40. However, even Mr. Bailey had trouble pinpointing these bits of proprietary information.

Q. Okay. Do you know whether Dave Kraenzle is using rubber in the same thickness that Young Dental is for his manufacture of prophy cups?

A. No.

Q. Do you have any reason to believe one way or the other whether he does or does not?

A. I don't know.

Q. All right. What is the time that Young Dental maintains the prophy making process? You mentioned the time. You mentioned earlier the time of the process was confidential.

A. Yes.

Q. What time were you referring to?

A. I'm talking about the time the press is closed and the rubber is curing.

Q. How long is that time?

A. I don't know.

Q. Are there any documents which reflect that time?

A. Yes.

Q. What are those documents?

A. That is something they have back in vulcanizing. I don't know exactly what those times are.

Q. Again, do you know whether Dave Kraenzle would know what the time is?

A. Yes.

Q. Have you yourself worked in the vulcanizing area making prophy cups?

A. Yes, I have. I have never actually molded any.

Q. Do you have a belief one way or the other whether Dave Kraenzle is using the same time that Young Dental uses for the process of making prophy cups?

A. I don't know that.

Q. Do you have any reason to believe one way or the other that he is or is not using that time?

A. I don't know.

Q. What is the pressure that Young Dental uses to maintain the compression molding process?

A. I don't know that either.

Deposition of Ron Bailey, Vol. III, pgs. 99–100. Bailey goes on to testify that information regarding time, pressure, and temperature for molding prophy cups is not actually in a document but rather on a chart somewhere in vulcanizing. Bailey Deposition, Vol. III, pgs. 100–101. He further states his belief that Kraenzle would have had access to this information because he molded cups, but that he (Bailey) had no personal knowledge that any of this information was being utilized by Kraenzle in making Q3's prophy cups. Bailey Deposition, Vol. III, pgs. 101–102.

Plaintiff provides no evidence to support its allegation that "the molding procedure for the Kraenzle cups was virtually identical to Young Dental's cup molding procedure". Plaintiff's Opposition to Defendants' Motion for Summary Judgment on Count I, pg. 7. Furthermore, it has failed to support its allegations that Carron used information pertaining to Young Dental's prophy cup molding process for Q3's benefit nor offered one shred of evidence to dispute Carron's sworn testimony that did not develop Q3's compression molds, the molding process or the design of Q3's prophy cup. Plaintiff has offered no evidence upon which a jury could reasonably find that any particular trade secret pertaining to Young Dental's prophy cup molding process existed or even if one did exist, that Carron used it for Q3's benefit.

■ Finally, the only proprietary information that anyone has identified is a single document contained in Carron's personal file which he took with him when he left plaintiff's employ. Both Carron and Richmond identified this document as some type of market plan. Carron Declaration, paragraph 7; Richmond Deposition, Vol. II, pg. 113. Carron attests that this document was distributed at a company-wide seminar. Plaintiff offers nothing to contradict this attestation. Furthermore, Richmond testified that this document, although marked "confidential", is "not very sensitive". Richmond De-

position, Vol. II, pg. 114. Plaintiff offers nothing to demonstrate that this document has been used in any way by Carron for the benefit of Q3. Plaintiff has failed to produce any evidence that Carron used or disclosed the information contained in the document marked "confidential" to the detriment of plaintiff. *See, Reddi–Wip, Inc. v. Lemay Valve Co.,* 354 S.W.2d 913, 917 (Mo.App. 1962); *see also, National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 32–33 (Mo.1966). Plaintiff has offered no evidence upon which a reasonable jury could find that Carron misappropriated this "confidential" document and used same for the benefit of Q3.

Since the basis for liability under Count III rests entirely upon the allegations of Count II, this Court finds that Count III fails also.

Having found that no material issues of fact exist regarding defendant Carron's acts with regard to inducement of patent infringement and the misappropriation of proprietary information (as well as constructive fraud), and having found no factual support for liability under same, summary judgment for Carron will be entered as a matter of law.